**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

IVF ORLANDO, LLC,

Debtor.
_______________________________________/

FOX FUNDING GROUP, LLC and
OVERTON FUNDING, LLC,

Appellants,

v. Case No. 6:25-cv-2115-ACC

IVF ORLANDO, INC.,

Appellee.
_________________________________________/

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

---

# APPELLANTS' INITIAL BRIEF

---

Shanna M. Kaminski, Esq.
*Admitted Pro Hac Vice*
**KAMINSKI LAW, PLLC**
P.O. Box 247
Grass Lake, Michigan 49240
Telephone: (248) 462-7111
Email:
skaminski@kaminskilawpllc.com

Lauren G. Raines, Esq.
Florida Bar No. 11896
**BRADLEY ARANT BOULT CUMMINGS, LLP**
1001 Water Street, Suite 1000
Tampa, FL 33602
Telephone: (813) 559-5500
Email: lraines@bradley.com

*Counsel for Appellants Fox Funding Group, LLC and Overton Funding, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

SUMMARY OF THE ARGUMENT ........ 14

ARGUMENT ........ 16

I. The Bankruptcy Court Erred When It Decided the Nature of the Transactions and the Extent and Validity of Appellants' Security Interests Outside of an Adversary Proceeding ........ 16

II. The Court Erred When It Concluded that Appellants Could Not Own Appellee's Post-Petition Receivables Because Future Accounts Receivable Cannot Be Sold ........ 20

III. The Bankruptcy Court Erred in Concluding the Appellants Do Not Have Security Interests in Post-Petition Receivables ........ 26

IV. The Bankruptcy Court Erred in Concluding the Transactions Between Appellants and Appellee Were Loans ........ 30

V. The Bankruptcy Court Erred When It Confirmed the Plan Because: (I) Appellee Did Not Meet Its Burden of Proving the Plan Should be Confirmed, (II) the Court Did Not Ensure That all Elements of Section 1129(a) Were Met and (III) all Elements of Section 1129(a) Were Not Met ........ 54

VI. The Bankruptcy Court Erred in Confirming the Plan Because Appellee Did Not Meet its Burden of Overcoming Appellant's Objections to Confirmation ........ 56

CONCLUSION ........ 57

CERTIFICATE OF COMPLIANCE ........ 58

CERTIFICATE OF SERVICE ........ 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apollo Funding Co. v. Dave Reilly Constr., LLC*,
242 N.Y.S.3d 86 (N.Y.A.D. 2 Dept. 2025) ....................................................31

*In re Aspen Village at Lost Mountain Memory Care*,
LLC, 609 B.R. 536 (N.D. Ga. 2019) ..............................................................56

*In re Assist-Med, Inc.*,
2017 Bankr. LEXIS 4062 (Bankr. SD Tex. Nov. 27, 2017 No. 16-31624-H5-11)........................................................................................................39

*Beausejour Corp., N.V. v. Offshore Dev. Co.*,
802 F.2d 1319 (11th Cir. 1986) .....................................................................33

*Bridge Funding Cap LLC v. SimonExpress Pizza, LLC*,
240 A.D.3d 1186 (N.Y.A.D. 4 Dept. 2025) ...................................................31

*In re Bumstead*,
782 F. Supp. 3d 1026 (W.D. Wash. 2025) .....................................................27

*In re Butler Trucking LLC*,
No. 24-32443, 2025 WL 1934205 (Bankr. N.D. Ohio July 14, 2025) ...............................................................................................................25

*In re Carter*,
203 B.R. 697 (Bankr. W.D. Mo. 1996) ..........................................................27

*In re Celotex Corp.*,
204 B.R. 586 (M.D. Fla. 1996).......................................................................55

*Charter Crude Oil Company v. Petroleos Mexicanos (In re The Charter Company)*,
125 B.R. 650 (M.D. Fla. 1991).........................................................................2

*Com. Bank, N.A. v. Chrysler Realty Corp.*,
244 F.3d 777 (10th Cir. 2001) ........................................................................25

*Craton Entm't, LLC v. Merch. Capital Grp. LLC*,
314 So. 3d 627 (Fla. Dist. Ct. App. 2021) *rehearing denied* 2021 Fla. App. LEXIS 9128 (Fla. 3d DCA 2021)....*passim*

*Davidson v. Davis*,
56 Fla. 476 (Fla. 1910)....39

*Diversified Enters., Inc. v. West*,
141 So.22 (Fla. 2d DCA 1962)....33, 38

*Eleison Composites, LLC v. Wachovia Bank, N.A.*,
267 Fed. Appx. 918 (11th Cir. 2008)....17

*Express Working Cap., LLC v. Starving Students, Inc.*,
28 F. Supp. 3d 660 (N.D. Tex. 2014)....22, 23

*Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*,
No. 22-1885-CV, 2023 WL 3882697 (2d Cir. June 8, 2023)....31

*Fox Capital Grp., Inc. v. F J Trucking*,
2022 N.Y. Misc. LEXIS 87524 (N.Y. Sup. Ct. 2022)....32

*Fox Capital Grp., Inc. v. Relik Realty, LLC*,
2023 N.Y. Slip Op. 32444(U) (N.Y. Sup. Ct. 2023)....32

*In re GEM Refrigerator Co.*,
512 B.R. 194 (Bankr. E.D. Pa. 2014), *as corrected* (June 13, 2014)....27

*Hurley V. Slingerland*,
461 So.2d 282 (Fla. 4th DCA 1985)....32

*In re Immenhausen Corp.*,
172 B.R. 343 (Bankr. M.D. Fla. 1994)....55

*In re J.C. Householder Land Trust # 1*,
501 B.R. 441 (M.D. Fla. 2013)....55

*In re Lett*,
632 F.3d 1216 (11th Cir. 2011)....55

*In re Level 8 Apparel, LLC*,
No. 16-13164 (JLG), 2024 WL 3379539 (Bankr. S.D.N.Y. July 11, 2024)....29

*In re McKenzie Contracting, LLC*,
No. 8:24-BK-01255-RCT, 2024 WL 3508375 (Bankr. M.D. Fla. July 19, 2024) (J. Colton) ....................24, 32, 41, 42

*McMillan, II v. Joseph Decosimo and Company (In re Das A. Borden & Company)*,
131 F.3d 1459 (11th Cir. 1997) ....................2

*Mitchell v. Hawley*,
83 U.S. 544, 21 L. Ed. 322 (1872)....................26

*In re Monticello Realty Investments, LLC*,
526 B.R. 902 (M.D. Fla. 2015)....................56

*In re Nightway Transp. Co., Inc.*,
96 B.R. 854 (Bankr. N.D. Ill. 1989) ....................27, 28

*Novartis Animal Health US, Inc. v. Earle Palmer Brown, LLC*,
424 F.Supp.2d 1358 (N.D. Ga. 2006)....................17

*Official Comm. Of Unsecured Creditors v. EBF Partners, LLC (In re Cornerstone Tower Servs.)*,
2019 Bankr. LEXIS 6 (Bankr. D Neb. Jan. 3, 2019, Nos. BK16-40787, A17-4050)....................39

*Oregrund Ltd. P'ship v. Sheive*,
873 So. 2d 451 (Fla. 5th DCA 2004)....................54

*OT Aspekt & Chiropractic PLLC v. Fox Cap. Grp., Inc.*,
154 N.Y.S.3d 217 (N.Y. Sup. Ct. 2021)....................32

*In re Piper Aircraft Corp.*,
244 F.3d 1289 (11th Cir. 2001) ....................54, 55

*In re R&J Pizza Corp.*,
No. 14-43066-CEC, 2014 WL 12973408 (Bankr. E.D.N.Y. Oct. 14, 2014) ....................23, 24, 29

*Royal Palm Vill. Residents, Inc. v. Slider*,
57 F.4th 960 (11th Cir. 2023) ....................35

*Samson MCA LLC v. Joseph A. Russo M.D. P.C.*,
219 A.D.3d 1126 (N.Y.A.D. 4 Dept. 2023) ....................31

*In re Shoot The Moon, LLC*,
635 B.R. 797 (Bankr. D. Mont. 2021) ....................................................38

*Singhal v. Unison Agreement Corp.*,
No. 22-60656-CIV, 2023 WL 2734230 (S.D. Fla. Mar. 31, 2023)....................32

*Smith v. Slott*,
754 F. Supp. 3d 1271 (S.D. Fla. 2024)....................................................19

*In re Stein Mart, Inc.*,
629 B.R. 516 (M.D. Fla. 2021)....................................................56

*Streamlined Consultants, Inc. v. EBF Holdings*,
LLC, No. 21-CV-9528 (KMK), 2022 WL 4368114 (S.D.N.Y.
Sept. 20, 2022) ....................................................31

*Summit Consulting, Inc. v. J.J. Walsh Construction, Inc.*,
568 So.2d 1290 (Fla. 2d DCA 1990)....................................................33, 38

*In re Sun Air Intern., Inc.*,
24 B.R. 135 (S.D. Fla. 1982) ....................................................17

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
No. 10-CV-2843 JG ARL, 2010 WL 3310262 (E.D.N.Y. Aug. 19,
2010) ....................................................26

*United Student Aid Funds, Inc. v. Espinosa*,
559 U.S. 260, 130 S. Ct. 1367, 176 L. Ed. 2d 158 (2010) ................................19

*US Info. Grp. LLC v. EBF Holdings, LLC*,
No. 22-CV-6661 (PKC), 2023 WL 6198803 (S.D.N.Y. Sept. 22,
2023) ....................................................31

*In re Walden Palms Condominium Association, Inc.*,
625 B.R. 543 (Bankr. M.D. Fla. 2020)....................................................54, 55

*In re Watchman Security*,
No. 24-00087-JMC-11, 2024 WL 4903363 (Bankr. S.D. Ind. 2024) ....20, 25, 38

**Statutes**

11 U.S.C. §363 ....................................................8

11 U.S.C. §506 ..................................................12, 29

11 U.S.C. §523(a)(2)(A) ..................................................11

11 U.S.C. §523(a)(2)(B) ..................................................11

11 U.S.C. §541(a) ..................................................8

11 U.S.C. §541(a)(1) ..................................................18

11 U.S.C. §547(a)(3) ..................................................21

11 U.S.C. §552 ..................................................9

11 U.S.C. §552(a) ..................................................15, 28, 29

11 U.S.C. §1129 ..................................................13, 55, 56

11 U.S.C. §1129(a) ..................................................*passim*

11 U.S.C. §1129(b) ..................................................1

11 U.S.C. §1191(b) ..................................................1

28 U.S.C. §157(b)(1) ..................................................1

28 U.S.C. §157(b)(2)(L) ..................................................1

28 U.S.C. §158(a)(1) ..................................................1

28 U.S.C. §158(d)(1) ..................................................1

Fla. Stat. Ann. §559.9611 ..................................................40

Fla. Stat. §679.1021 ..................................................21

U.C.C. Article 9 ..................................................*passim*

U.C.C. §1-201(b)(35) ..................................................17

U.C.C. §9-109(a)(3) ..................................................29

U.C.C. §9-204 ..................................................27

U.C.C. §9-309(2) ..................................................17

U.C.C. §9-318 ........................................ 8, 25

U.C.C. §9-318(a) ........................................ 17, 22, 24, 25

**Other Authorities**

Fed. R. Bankr. P. 7001 ........................................ 18, 19

Fed. R. Bankr. P. 7001(b) ........................................ 8, 16, 18

Fed. R. Bankr. P. 8002(a)(1) ........................................ 1

Fed. R. Bankr. P. 8013 ........................................ 2

Fed. R. Bankr. P. 8015(a)(5) ........................................ 58

Fed. R. Bankr. P. 8015(a)(7) ........................................ 58

Fed. R. Bankr. P. 8015(g) ........................................ 58

# JURISDICTIONAL STATEMENT

On September 23, 2025, the Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court") entered an Order (1) Confirming Subchapter V Plan of Reorganization for IVF Orlando, Inc. on a Non-Consensual Basis Pursuant to 11 U.S.C. §§1129(a), (b) and 1191(b); and (2) Setting Post-Confirmation Status Conference ("Order Confirming Plan"). Then, on October 3, 2025, the Court issued a Memorandum Opinion on Objections to Confirmation ("Opinion"). The Bankruptcy Court has subject matter jurisdiction over confirmation of a plan of reorganization pursuant to 28 U.S.C. §§157(b)(1) and (b)(2)(L).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §158(a)(1), which provides that the District Courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts. The Order Confirming Plan is a final order that is immediately appealable, pursuant to 28 U.S.C. §§158(a)(1) and (d)(1), and the Opinion outlines the reasons for entry of the Order Confirming Plan.

On October 6, 2025, Appellants timely filed their Notice of Appeal fourteen (14) days after the Order Confirming Plan was entered, pursuant to Fed. R. Bankr. P. 8002(a)(1).

## STATEMENT OF THE ISSUES

**Issue One:** Whether the Bankruptcy Court Erred When It Decided the Nature of the Transactions and the Extent and Validity of Appellants' Security Interests Outside of an Adversary Proceeding

**Issue Two:** Whether the Bankruptcy Court Erred When It Concluded that Appellants Could Not Own Appellee's Post-Petition Receivables Because Future Accounts Receivable Cannot Be Sold

**Issue Three:** Whether the Bankruptcy Court Erred in Concluding Appellants Do Not Have Security Interests in Post-Petition Receivables

**Issue Four:** Whether the Bankruptcy Court Erred in Concluding the Transactions Between Appellants and Appellee Were Loans

**Issue Five:** Whether the Bankruptcy Court Erred When It Confirmed the Plan Because (I) Appellee Did Not Meet its Burden of Proving the Plan Should Be Confirmed, (II) the Court Did Not Ensure That All Elements of Section 1129(a) Were Met and (III) all Elements of Section 1129(a) Were Not Met

**Issue Six:** Whether the Bankruptcy Court Erred in Confirming the Plan Because Appellee Did Not Meet its Burden of Overcoming Appellant's Objections to Confirmation

> **Standard of Review:** With respect to each of the six (6) issues outlined, the District Court is to review the bankruptcy court's conclusions of law de novo and findings of fact using the clearly erroneous standard. *See*, Federal Rule of Bankruptcy Procedure 8013; *McMillan, II v. Joseph Decosimo and Company (In re Das A. Borden & Company)*, 131 F.3d 1459, 1462 (11th Cir. 1997); *Charter Crude Oil Company v. Petroleos Mexicanos (In re The Charter Company)*, 125 B.R. 650, 654 (M.D. Fla. 1991).

## STATEMENT OF THE CASE

*Revenue Based Financing Generally*

Appellants are both Florida based companies that specialize in providing working capital to businesses. The product primarily offered by Appellants, which the Bankruptcy Court refers to in its Opinion as "merchant cash advance," is revenue-based financing. In revenue-based financing transactions, a business sells, assigns and transfers a portion of its future accounts receivable. The buyer makes an upfront lump sum payment to the business to purchase the future accounts receivable. The lump sum payment made by the buyer is meant to provide immediate working capital to the business.

The business is then obligated, not to "payback" any specific amount to the buyer, but rather, to remit a percentage of each account receivable collected by the business after the agreement is entered into until all accounts receivable purchased have been remitted to buyer. That obligation is contingent; it lies if, and only if, the business collects receivables. For convenience, the parties agree to a set remittance amount each week that reflects a good faith estimate of that percentage of the receivables, however, the business is permitted at any time to request an adjustment to more accurately reflect the percentage of its receivables in the event of a business slow down, or a reconciliation in the event of an over remittance.

Under revenue-based financing transactions, there is no interest rate and no specific time period within which the accounts receivable purchased must be remitted because the obligation to remit the future accounts receivable purchased is tied to actual collections. No matter how long it takes to remit the purchased amount of receivables, the purchased amount of receivables can never increase. And if the purchased amount of future receivables never gets delivered, the buyer has no recourse.

If the business does not collect accounts receivable, the business is not obligated to remit anything and not making a remittance would not be an event of default because, again, the business's obligation is to remit a percentage of collected accounts receivable.

Similarly, if the business were to go out of business in the ordinary course, the business would no longer have any obligation to remit accounts receivable and not doing so would not be an event of default. The buyer's investment in the purchase of receivables will be lost without recourse against the business or its owners.

This type of transaction provides flexibility for a business that does not exist with traditional business loans. For example, if the business is seasonal, the amount to be remitted during the business's slow season may be dramatically reduced or even eliminated if no accounts receivable were collected as each remittance is tied to a percentage of collections. This differs drastically from a loan which has a

definite term and requires payments on a specific schedule, the mere failure of which would result in a default.

*Appellants Agreements with Appellee*

In September of 2024, Appellee, IVF Orlando, Inc., approached both Appellants seeking working capital. During due diligence, Appellee represented and warranted to both Appellants that it was not insolvent, did not contemplate filing for bankruptcy in the next six months and had not consulted with a bankruptcy attorney. Appellants relied upon these representations and warranties in making a risky investment purchasing a portion of Appellee's receivables.

On September 16, 2024, Overton entered into a Standard Merchant Cash Advance Agreement ("Overton Agreement") with the Appellee under which Appellee sold, assigned and transferred $166,800 in future accounts receivable to Overton. Appellee was obligated to remit 6% of each account receivable collected until the entire $166,800 of future accounts receivable were remitted to Overton.

Appellee agreed that for the purposes of Overton obtaining the accounts receivable it purchased, it would designate a bank account into which the collected accounts receivable would be deposited. Overton would then ACH debit the 6% of collected accounts from the designated bank account. Appellee agreed that initially a specific amount ($3,971 weekly) would be ACH debited from the designated bank account. That amount was determined based upon a review of historical revenue

information provided to Overton during due diligence and, as expressly stated in the Overton Agreement, was meant to equal 6% of collected accounts weekly. The amount to be ACH debited from the designated account was thereafter subject to adjustment pursuant to Paragraph 4 of the Overton Agreement, which Overton was obligated to provide if requested by Appellee.

On or about September 16, 2024, Overton provided Appellee with $117,600 of working capital for its business. Two weekly ACH debits of $3,971 were made on September 20, 2024 and September 27, 2024, respectively, from the designated bank account but nothing further was remitted to Overton by Appellee – not because it was not collecting accounts receivable but because the October 4, 2024 ACH debit was returned for insufficient funds and, one business day later, on October 8, 2024, Appellee filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in this Court.

Thus, just twenty-two (22) days after representing to Overton that it was not insolvent, did not contemplate filing for bankruptcy in the next six months and had not consulted with a bankruptcy attorney and Overton paying it $117,600 to purchase the future accounts receivable relying on such representations, Appellee filed for bankruptcy. Overall, Appellee received $109,658 more than it ever remitted back to Overton as of the date it filed its voluntary petition.

On September 19, 2024, Fox entered into a Future Receivables Sale and Purchase Agreement ("Fox Agreement") with Appellee under which Fox purchased and Appellee sold, assigned and transferred to Fox $92,300 of future accounts receivable.

Appellee agreed that for the purposes of Fox obtaining the accounts receivable it purchased, it would designate a bank account into which the collected accounts receivable would be deposited. Fox would then ACH debit 4.8% of collected accounts from the designated bank account. Appellee agreed that initially a specific amount ($3,076.65 weekly) would be ACH debited from the designated bank account. That amount was determined based upon a review of historical revenue information provided to Fox during due diligence and, as expressly stated in the Fox Agreement, was meant to equal 4.8% of collected accounts weekly. The amount to be ACH debited from the designated account was thereafter subject to adjustment pursuant to Sections 1.4 and 1.5 of the Fox Agreement.

On or about September 19, 2024, Fox provided Appellee with $63,700 of working capital for its business. One weekly ACH debit of $3,076.65 was made on September 26, 2024 from the designated bank account but nothing further was remitted to Fox by Appellee because, again, Appellee filed for bankruptcy on October 8, 2025. Overall, Appellee received $60,623.35 more than it ever remitted to Fox as of the date Appellee filed its voluntary petition.

*The Bankruptcy Case*

After the bankruptcy case was filed, Appellants were faced with functionally two options – immediately raise the issue of whether the future accounts receivable they purchased from Appellee were property of the estate and whether the obligation to remit the future accounts receivable was subject to reorganization[1] or, since the Appellee would be required to file a proposed plan of reorganization within ninety (90) days, wait to see the proposal and, if unacceptable, then raise the issues.

As Fox and Overton had already sustained significant losses due to Appellee defrauding them by entering the transactions knowing it was having (undisclosed)

---

[1] If Appellants had objected to use of cash collateral, they would have argued that the accounts receivable they purchased from Appellee were not property of the bankruptcy estate and that the obligation to remit the accounts receivable is not a debt and is not subject to reorganization. Section 541(a) of the Bankruptcy Code defines property of the estate as all legal or equitable interests in property as of the date the case was filed. Section 9-318 of the Uniform Commercial Code provides that and, as such, they could not be used as cash collateral as the Court can only authorize use of property of the estate under 11 U.S.C. §363 and, of course, only has jurisdiction over property that is property of the estate in any event. Generally, the determination whether property is property of the bankruptcy estate requires an adversary proceeding. Fed. R. Bankr. P. 7001(b) expressly states that "a proceeding to determine the validity, extent or priority of a lien or other interest in property" requires an adversary proceeding and cannot be decided in the context of a contested matter. This issue is addressed further in the Argument section of the brief.

The decision to wait to raise the issues was also based upon prior experience. Courts in the Middle District of Florida typically permit the use of cash collateral over such an objection, particularly when it is solely an interim order where all rights are reserved (which was the case with all orders entered in the case) and the issues are ultimately decided in an adversary proceeding as they are required to be.

financial issues and likely contemplating bankruptcy, it appeared as though Appellee may be capable of proposing a plan of reorganization that would satisfy the obligations to Appellants, the cash collateral orders provided replacement liens to Appellants to the extent their security interests cut off under 11 U.S.C. §552, and Appellee never sought a final cash collateral order in the case, they elected to take a wait and see approach, as there would be no point in incurring the costs of an objection and initiating an adversary proceeding on the issues if the plan of reorganization proposed was acceptable.

Overton and Fox timely filed proofs of claim in the case to preserve their rights in the event the obligations were to be deemed debts. On December 16, 2024, Overton filed a secured proof of claim in the amount of $158,858 and attached the Overton Agreement and its UCC-1 Financing Statement to the claim [Claim No. 7] ("Overton Claim"). The basis was the Overton Agreement and the amount was the amount of accounts receivable that were purchased by Overton from Appellee under the Overton Agreement that had not yet been remitted.

On December 16, 2024, Fox filed a secured proof of claim in the amount of $89,223.35 and attached the Fox Agreement and its UCC-1 Financing Statement. [Claim No. 8] ("Fox Claim"). The basis was the amount of accounts receivable that were purchased from Appellee under the Fox Agreement that had not been remitted.

On January 6, 2025, the Appellee filed its Subchapter V Plan of Reorganization [DN 54] ("Plan"). The Overton Claim was treated in Class 3 as follows:

> Class 3 consists of the Allowed Claim of Overton Funding, LLC ("Overton"). Pursuant to Bankruptcy Code Section 506, the Class 3 Claim of Overton is wholly unsecured. Thus, on the Effective Date, all mortgages and liens held by the Class 3 Claimholder shall be extinguished and, to the extent retains an Allowed Claim, such Claim shall be treated as an Allowed Unsecured Claim pursuant to the terms of Class 8 below. Class 3 is Impaired.

The Fox Claim was treated in Class 4 as follows:

> Class 4 consists of the Allowed Claim of Fox Funding Group, LLC ("Fox Funding"). Pursuant to Bankruptcy Code Section 506, the Class 4 Claim of Fox Funding is wholly unsecured. Thus, on the Effective Date, all mortgages and liens held by the Class 4 Claimholder shall be extinguished and, to the extent retains an Allowed Claim, such Claim shall be treated as an Allowed Unsecured Claim pursuant to the terms of Class 8 below. Class 4 is Impaired.

All claims in Class 8 were projected to receive a total distribution of less than $10,000 over 3 years.

On January 8, 2025, the Bankruptcy Court entered an Order (I) Scheduling Hearing on Confirmation of Plan of Reorganization, (II) Setting Related Deadlines, and (III) Setting Deadlines for Filing Administrative Expense Applications [DN 58] ("Scheduling Order"). The Scheduling Order set the deadline to object to confirmation of the Plan as "no later than seven days before the Confirmation Hearing." The Confirmation Hearing was scheduled for February 19, 2025.

On February 12, 2025, Appellants both filed Objections to Confirmation of the Plan because the treatment of the Overton Claim and Fox Claim in the Plan was unacceptable. *See* DNs 73 and 74 (the "Confirmation Objections"). In the Confirmation Objections, Fox and Overton argued, among other things, that the Bankruptcy Court could not confirm the Plan until the issue of whether the future accounts receivable Fox and Overton purchased pre-petition were property of the estate, or the property of Appellants, was determined because Appellee was seeking to use the future accounts receivable sold to Appellants to fund the Plan.

Appellants also initiated adversary proceedings on February 18, 2025, seeking determinations of whether the accounts receivable the Appellee sold to them were property of the bankruptcy estate and bringing claims for turnover and conversion to recover the future accounts receivable used by the Appellee to the extent the accounts receivable were deemed to not be property of the estate. Additionally, to the extent the obligations were deemed to not be true sales and, instead, gave rise to debts, Appellants sought to have the obligations deemed not subject to any discharge that may be obtained by Appellee under 11 U.S.C. §§523(a)(2)(A) and (B) on the basis of fraud.

The confirmation hearing was scheduled to occur on February 19, 2025. However, due to Appellants' pending Confirmation Objections and other objections to confirmation that were filed, the confirmation hearing did not occur. Instead, at

the February 19, 2025 hearing, the Bankruptcy Court scheduled a status conference for April 3, 2025 to allow time for Appellee to attempt to resolve the Confirmation Objections and other objections to confirmation that were filed in the case.

On March 24, 2025, Appellee filed motions to determine the secured status of Fox and Overton's claims ("Valuation Motions") [DN 97, 98]. Appellants responded to the Valuation Motions [DN 108, 109] but ultimately negotiated agreed orders providing that to the extent the Court did not find their transactions with the Appellee to be true sales and based upon the collateral valuation on the petition date under 11 U.S.C. §506, the Fox Claim and Overton Claim were unsecured. [DN 122].

At the April 3, 2025 status conference, the Bankruptcy Court continued the confirmation hearing again to June 5, 2025. Notably, neither the Bankruptcy Court nor Appellee sought an expedited determination of the true sale issue to ensure the determination would be accomplished prior to the confirmation hearing. Additionally, at no time did the Bankruptcy Court indicate it wished to determine the true sale issue outside of the adversary proceeding or at confirmation.

Further, despite the two prior plan confirmation settings, the issues discussed in the Opinion were not argued at any time by Appellee or raised by the Bankruptcy Court before the issuance of the Opinion. Appellants had no notice of the issues discussed in the Opinion or opportunity to respond.

On June 5, 2025, the Bankruptcy Court held a trial on confirmation of the Plan. At the hearing, Appellee put on no testimony. A few documents were admitted into evidence and Appellee argued that the Plan could be confirmed because it could be modified if the Bankruptcy Court subsequently decided the transactions were true sales.

Appellants' counsel reiterated their primary position – that confirmation was premature because the true sale issue needed to be decided first – and explained the impact a true sale decision would have on the elements of 11 U.S.C. §1129, which included that it would impact feasibility of the Plan – an issue never addressed by the Bankruptcy Court in its Opinion or otherwise.

Again, the Bankruptcy Court never indicated that it would be deciding the true sale issue in connection with the confirmation hearing and never raised the other issues raised in its Opinion at any time – nor were they raised by Appellee's counsel. Appellants were under the impression that if the Court were to confirm the Plan, it would be based upon the sole argument made by Appellee counsel – that the Plan could be subsequently modified – as no other arguments were made by Appellee.

Appellants were thus surprised by the Court's oral ruling determining issues that had never been previously raised and that Appellants had not had an opportunity to respond to. Appellants were even more surprised to see the Opinion, which was

issued just one business day prior to the deadline to appeal the Order Confirming Plan.

## SUMMARY OF THE ARGUMENT

Appellants were deprived of their constitutional due process rights when the Bankruptcy Court decided issues in the Opinion that require an adversary proceeding, were never raised at any time by Appellee or the Bankruptcy Court and, more importantly, because Appellants were not provided with notice or an opportunity to be heard on any of the issues decided by the Bankruptcy Court in the Opinion. This was unquestionably procedural error requiring this Court reverse the Order Confirming Plan.

Reversal is also warranted because the legal conclusions made by the Bankruptcy Court in the Opinion are erroneous. The Bankruptcy Court's legal conclusion that Appellants could not own Appellee's future accounts receivable because future accounts receivable cannot be sold is contrary to the very definition of account receivable which expressly includes accounts that have not yet come into existence, ignores numerous decisions upholding sales of future accounts receivable and misapplies the legal principle of *nemo dat quod non habet*.

The Bankruptcy Court's legal conclusion that Appellants could not have a security interest in property that has not yet come into existence (i.e. future accounts receivable) is contrary to Article 9 of the Uniform Commercial Code which

expressly authorizes a secured party to have a security interest in after-acquired property and ignores that 11 U.S.C. §552(a) is inapplicable when the transaction is a true sale.

The Bankruptcy Court's legal conclusion that the transactions between Appellants and Appellee are loans completely disregards well established Florida law – the law applicable to the Fox Agreement and Overton Agreement – which was not even applied by the Bankruptcy Court in the Opinion.

Finally, reversal is warranted because prior to confirming the Plan, the Bankruptcy Court did not ensure that all elements of 11 U.S.C. §1129(a) were met as it was required to do and Appellant did not meet its burden of proving the Plan should be confirmed by a preponderance of the evidence or meet its burden of overcoming Appellant's objections to confirmation.

## ARGUMENT

### I. The Bankruptcy Court Erred When It Decided the Nature of the Transactions and the Extent and Validity of Appellants' Security Interests Outside of an Adversary Proceeding

Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules," and each, a "Bankruptcy Rule") 7001 sets forth the types of proceedings that must be brought as adversary proceedings. Bankruptcy Rule 7001(b) expressly states that "a proceeding to determine the validity, priority, or extent of a lien or other interest in property" is an adversary proceeding.

In the Opinion, the Bankruptcy Court made determinations that require an adversary proceeding. First, the Bankruptcy Court decided, without any notice or opportunity to respond by Appellants, that Appellants did not have a security interest in accounts receivable. This was a determination of the validity and extent of Appellants' liens which, pursuant to the plain language of Bankruptcy Rule 7001(b), required an adversary proceeding.

Second, the Bankruptcy Court decided the nature of the transactions between Appellants and Appellee in the Opinion, again without giving Appellants any notice or opportunity to respond. This was also a determination of an interest in property that required an adversary proceeding pursuant to Bankruptcy Rule 7001(b).

The Bankruptcy Court's decision to address these matters in a contested matter, instead of an adversary proceeding, was in error and must be reversed. A

sale of accounts receivable not only transfers the rights in the account to the purchaser, it gives the purchaser a security interest in the account. U.C.C. §§ 9-309(2), 9-318(a). In fact, the Uniform Commercial Code deliberately avoids distinguishing between sales and secured transactions involving accounts. *See, e.g. Eleison Composites, LLC v. Wachovia Bank, N.A.*, 267 Fed. Appx. 918 (11th Cir. 2008); *Novartis Animal Health US, Inc. v. Earle Palmer Brown, LLC*, 424 F.Supp.2d 1358 (N.D. Ga. 2006); *In re Sun Air Intern., Inc.*, 24 B.R. 135 (S.D. Fla. 1982). The UCC comments further clarify that although Article 9 occasionally distinguishes between outright sales of accounts receivables and sales that secure an obligation, neither Article 9 nor the definition of 'security interest' set forth in U.C.C. §1-201(b)(35) delineates how a particular transaction is to be classified. That issue is left to the courts.

The distinction between an outright or, said more commonly, "true sale" of accounts receivable and an assignment of accounts receivable for security is an important one. If the transaction is an outright sale of accounts, as Appellants assert their transactions with Appellee are, the Appellee retains no legal or equitable interest in the accounts sold. *See* U.C.C. §9-318(a) ("A debtor that has sold an account, chattel paper, payment intangible, or promissory note does not retain a legal or equitable interest in the collateral sold."). As such, if the transactions between Appellants and Appellee are indeed true sales of accounts receivable, the

accounts sold are not property of the bankruptcy estate. *See* 11 U.S.C. §541(a)(1) (defining property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case."). Furthermore, in a true sale, the purchaser automatically obtains a security interest in the property purchased.

Thus, the true sale determination is a determination of an interest in property *and* a determination of the validity of a lien. Both of these are plainly adversary proceedings. Bankruptcy Rule 7001(b).

As such, Appellants each properly initiated an adversary proceeding seeking a determination that their transactions with Appellee were true sales. In rendering its Opinion, the Bankruptcy Court asserted that the issues could not wait to be determined in the adversary proceeding. This was surprising given that Appellants had been asserting the issue needed to be decided before the Plan was confirmed since they filed their Objections and the adversary proceedings had been pending for several months before the confirmation hearing. If the Bankruptcy Court believed that the issues could not wait, it could have and should have set an expedited schedule for the determination of the true sale issue in the adversary proceeding – the proper proceeding for determining the issue per Rule 7001.[2] The parties would have had ample time to conduct discovery, brief the issues, and even conduct a trial.

[2] A bankruptcy court can in some instances determine issues that procedurally are required to be adversary proceedings as contested matters, but only if the parties are provided with adequate due process. Here, among the other issues, there was no

Instead, the Bankruptcy Court improperly made the determination in connection with the confirmation hearing without any warning to Appellants, any opportunity to brief the issue, or any evidentiary hearing. (Indeed, there was no evidence on the true sale issue even before the Bankruptcy Court at confirmation, and the Bankruptcy Court did not provide Appellants an opportunity to put on any evidence on the issue).

The failure to conduct an adversary proceeding when required by Rule 7001 constitutes procedural error. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271–72, 130 S. Ct. 1367, 1378, 176 L. Ed. 2d 158 (2010). Procedural errors must be reversed when a party does not receive adequate notice and opportunity to be heard. *Id.*; *see also*, *Smith v. Slott*, 754 F. Supp. 3d 1271, 1294 (S.D. Fla. 2024).

That is exactly the case here. Appellants' constitutional due process rights were unquestionably violated because they were not provided with adequate notice or opportunity to be heard on the issues that were decided in the Opinion. *See, e.g. Smith v. Slott*, 754 F. Supp. 3d 1271, 1294 (S.D. Fla. 2024). Indeed, a review of the record shows that none of the issues decided by the Court in the Opinion were ever raised or argued by the Appellee and the Court never provided Appellants the opportunity to brief or submit evidence on the issues decided in the Opinion. As

warning to Appellants that the Bankruptcy Court would deciding the issue in the context of confirmation and the parties were not provided with any opportunity to brief the issues or submit evidence at the confirmation hearing.

such, Appellants had no notice whatsoever the issues raised in the Opinion even were issues, and they certainly were not provided an opportunity to respond to them at any time.

What's more, as will be demonstrated throughout this brief, if Appellants had been provided with an opportunity to respond, the outcome certainly would have been different.

## II. **The Court Erred When It Concluded that Appellants Could Not Own Appellee's Post-Petition Receivables Because Future Accounts Receivable Cannot Be Sold**

The Bankruptcy Court concludes in the Opinion that Appellants cannot own post-petition receivables because purportedly, future accounts receivable cannot be sold relying on the legal principal *nemo dat quod non habet*, treatises, and a single case, *In re Watchman Security*, No. 24-00087-JMC-11, 2024 WL 4903363 (Bankr. S.D. Ind. 2024), in which the court raised this particular issue *sua sponte* in an opinion on a claim objection and, like here, did not provide the claimant with an opportunity to respond to any of the issues raised. Had the claimant in *In re Watchman Security* had the opportunity to provide the arguments and authority now summarized herein, rather than that court trampling over the claimant's constitutional due process rights, the outcome in *In re Watchman Security* likely would have been different.

### *A. The Bankruptcy Court's Conclusion that Future Accounts Receivable Cannot be Sold is Inconsistent with the Definition of Accounts Receivable*

The Bankruptcy Court's conclusion that future accounts receivable cannot be sold ignores the very definition of the term account receivable under applicable law. The Bankruptcy Code defines "receivable" as "right to payment, whether or not such right has been earned by performance." *See* 11 U.S.C. §547(a)(3). The Uniform Commercial Code similarly defines the term "account" as "a right to payment of a monetary obligation, whether or not earned by performance."[3] These definitions by their plain language include rights to payment that have not yet come into existence.

The Bankruptcy Court ignored the very definition of accounts receivable when it incorrectly concluded in the Opinion, without citing any authority:

> U.C.C. § 9-318(a) does not alter this result [i.e. that future accounts receivable cannot be sold] because it presupposes the existence of a property right to convey. Specifically, U.C.C. § 9-318(a) references accounts, chattel paper, payment intangibles, and promissory notes, each a type of property the U.C.C. contemplates to exist in the present for the purposes of conveyance.
>
> To wit, U.C.C. § 9-102(a)(12) defines "collateral" to mean "the *property* subject to a security interest . . . [including] (A) proceeds to which a security interest attaches; (B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold . . ." (emphasis added). A hope of future receivables is not property within the meaning of U.C.C. § 9-318(a) or U.C.C. § 9-102(a)(12).

[3] Fla. Stat. §679.1021 defines the term "account" the same way.

What's more, the Bankruptcy Court cites no authority in its Opinion for its assertion that "U.C.C. §9-318(a) contemplates [accounts] to exist in the present for the purposes of conveyance."

*B. The Bankruptcy Court's Conclusion that Future Accounts Receivable Cannot be Sold Ignores That Federal Courts Have Expressly Held That Sales of Future Accounts Receivable Are True Sales*

The Bankruptcy Court's Opinion ignores that federal courts that have been faced with the question of whether future accounts receivable can be sold have answered in the affirmative. For example, in *Express Working Capital, LLC*, the District Court for the Eastern District of Texas when ruling on a motion for summary judgment expressly rejected the argument that accounts receivable cannot be sold if they did not exist at the time the agreement was entered into:

> The Court finds that the future credit card receivables in the Agreements are properly characterized as "accounts." The parties defined "Future Receivables" as Defendants' "future accounts and contract rights arising from and relating to the payment of monies from the use by [Defendants'] customers of ... credit cards, charge cards, debit cards, and/or prepaid cards...." *See, e.g.,* Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. at 5–6, ECF No. 101. ***Defendants argue that Section 306.103(b) cannot apply because the accounts were not in existence at the time of the Agreements***. *See* Defs.' Br. Supp. Mot. Summ. J. 15, ECF No. 87; Defs.' Reply 3–4, ECF No. 125. ***The Finance Code does not state that the "accounts, instruments, documents, or chattel paper" must be in existence when the parties enter into their financial arrangement and Defendants have not provided any support for their argument that Section 306.103(b) does not apply to accounts that were not in existence at the time of the arrangement***. *Cf. Fast Cap. Mktg., LLC v. Fast Cap. LLC,* No. H–08–2142, 2008 WL 5381309, at *2 (S.D.Tex. Dec. 24, 2008)

> (noting defendant was in business of "purchasing future credit-card receipts at a discount from merchants in exchange for cash").
>
> The Code does not define "account" or "accounts receivable," but the Texas Business and Commerce Code defines an "account" as "a right to payment of a monetary obligation, whether or not earned by performance." Tex. Bus. & Com.Code Ann. § 9.102(a)(2). Black's Law Dictionary defines an "account" as "[a] detailed statement of the debits and credits between parties to a contract," and an "account receivable" as "a balance owed by a debtor" or "a debt owed by a customer to an enterprise for goods or services." Black's Law Dictionary (9th ed.2009); *see also In re Blast Energy Servs., Inc.,* 396 B.R. 676, 705 (Bankr.S.D.Tex.2008) ("[A]n account receivable denotes a right to payment."). When Defendants' customers purchase Defendants' goods and services with credit cards, charge cards, debit cards, or prepaid cards, "future accounts and contract rights" are created, and Defendants have a right to receive payment from their customers. Under the Agreements, Defendants sold a portion of their right to receive payment on these accounts to Plaintiff. *See, e.g.,* Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. at 5–6, ECF No. 101; *see also New Century Fin., Inc. v. Olympic Credit Fund, Inc.,* 487 Fed.Appx. 912, 913 (5th Cir.2012) ("Factoring is a type of financing where one business ... sells its right to receive payment for goods sold or services rendered ... to another business at a discounted price."). For these reasons, the Court finds that the "Future Receivables" are accounts for purposes of Section 306.103(b).

*Express Working Cap., LLC v. Starving Students, Inc.*, 28 F. Supp. 3d 660, 667-668 (N.D. Tex. 2014) (emphasis added).

Even more closely aligned with this case is the case *In re R & J Pizza Corp*., which enforced a prepetition sale of future accounts receivable. In *R&J Pizza Corp*., Bankruptcy Court for the Eastern District of New York found that a sale of future accounts receivable was a true sale of accounts receivable not a disguised financing arrangement and, as such, the debtor retained no legal or equitable interest in future

accounts receivable that it sold pre-petition pursuant UCC §9-318(a), and future accounts receivable sold pre-petition were not property of the bankruptcy estate. *In re R&J Pizza Corp.*, No. 14-43066-CEC, 2014 WL 12973408 (Bankr. E.D.N.Y. Oct. 14, 2014).

*R&J Pizza Corp.* also makes it clear why there was no post-petition sale requiring Court authorization. The sale of future accounts receivable was completed in all respects pre-petition. As such, Appellee no longer had a legal or equitable interest in the accounts receivable on the date the bankruptcy case was filed, and the accounts receivable were not property of the bankruptcy estate. As they were not estate property, there was no need for Court authority to sell accounts receivable post-petition because, again, the sale of the future accounts receivable occurred pre-petition.

Finally, the Bankruptcy Court even ignored authority from another judge of the Bankruptcy Court for the Middle District of Florida upholding sales of future accounts receivable as true sales. For example, in *In re McKenzie Contracting, LLC*, the Bankruptcy Court for the Middle District of Florida concluded that several separate sales of future accounts receivable were true sales. *In re McKenzie Contracting, LLC*, No. 8:24-BK-01255-RCT, 2024 WL 3508375, at *2 (Bankr. M.D. Fla. July 19, 2024) (J. Colton).

### *C. The Legal Principle Nemo Dat was Incorrectly Applied by the Bankruptcy Court*

The legal principle *nemo dat quod non habit* was incorrectly applied by the Bankruptcy Court (and in the *In re Watchman Security* case on which it relied). The principle of *nemo dat* is expressed in UCC §9-318. *Com. Bank, N.A. v. Chrysler Realty Corp.,* 244 F.3d 777, 783 (10th Cir. 2001). In the context of U.C.C. §9-318, *nemo dat* has only been applied to establish that the purchaser/assignee of accounts receivable takes its right to receive funds subject to the right of the account debtor to pay them to the seller/assignor. *Id*. In other words, under UCC §9-318(a), to the extent there is a contract between the account debtor and assignor/purchaser, the assignee's/purchaser's rights are subject to all the terms of the contract between the account debtor and assignor/seller and any defense or claim arising therefrom. *Id*.

Appellants can find no case in which the principle of *nemo dat* has ever been applied to mean that if accounts receivable do not yet exist at the time of their sale/assignment they cannot be sold/assigned. It has never been applied in this way because, again, such an interpretation is wholly inconsistent with the definition of accounts, which expressly includes accounts that have not yet come into existence.

Even *In re Butler Trucking*, which is cited in the Opinion, does not support the Bankruptcy Court's conclusion that accounts not yet in existence cannot be sold as the *Butler Trucking* court did not even come to such a conclusion. *In re Butler Trucking LLC*, No. 24-32443, 2025 WL 1934205, at *9 (Bankr. N.D. Ohio July 14,

2025) (declining to hold that that the accounts receivable not yet in existence cannot be sold).

Finally, the Bankruptcy Court's conclusion is also illogical when analyzed considering the meaning of the principle. The principle was established in *Mitchell v. Hawley*, as follows:

> No one in general can sell personal property and convey a valid title to it unless he is the owner or lawfully represents the owner. Persons, therefore, who buy goods from one not the owner, and who does not lawfully represent the owner, however innocent they may be, obtain no property whatever in the goods, as no one can convey in such a case any better title than he owns, unless the sale is made in market overt, or under circumstances which show that the seller lawfully represented the owner.

*Id.* at 550.[4] Appellee owned the accounts receivable it intended to generate in the future. As Appellee was the only party with an interest in the future accounts receivable, it could obviously sell its interest.

## III. <u>The Bankruptcy Court Erred in Concluding the Appellants Do Not Have Security Interests in Post-Petition Receivables</u>

The Bankruptcy Court incorrectly held Appellants could not have a security interest in property that has not yet come into existence. Federal courts consistently recognize and enforce security interests in after-acquired property. The validity of

[4] It is worth noting an account receivable is money owed to a business, not goods. The law provides a broad exception to the rule of *nemo dat quod non habet* in the case of money. *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-CV-2843 JG ARL, 2010 WL 3310262, at *3 (E.D.N.Y. Aug. 19, 2010).

security interests in property not yet in existence is firmly established under Article 9 of the Uniform Commercial Code, as adopted by states and applied in federal courts. U.C.C. §9-204 expressly permits security agreements to create or provide for security interests in after-acquired property. *See also, e.g. In re Carter*, 203 B.R. 697, 703 (Bankr. W.D. Mo. 1996) (interpreting U.C.C. §9-204); *In re GEM Refrigerator Co.*, 512 B.R. 194, 208 (Bankr. E.D. Pa. 2014), *as corrected* (June 13, 2014) ("Subsection (a) makes clear that a security interest [in] after-acquired property [] is no less valid than a security interest in collateral in which the debtor has rights at the time value is given. A security interest in after-acquired property is not merely an "equitable" interest; no further action by the secured party—such as a supplemental agreement covering the new collateral is required. This section adopts the principle of a "continuing general lien" or "floating lien." It validates a security interest in the debtor's existing and (upon acquisition) future assets, even though the debtor has liberty to use or dispose of collateral without being required to account for proceeds or substitute new collateral...."); *In re Nightway Transp. Co., Inc.*, 96 B.R. 854, 858 (Bankr. N.D. Ill. 1989); *In re Bumstead*, 782 F. Supp. 3d 1026, 1028 (W.D. Wash. 2025).

Both the Fox Agreement and Overton Agreement clearly establish an interest in after-acquired accounts receivable. Per the express terms of the Fox Agreement and Overton Agreement, Appellee sold *future* accounts receivable to them. *See, e.g.,*

*In re Nightway Transp. Co., Inc.*, 96 B.R. 854, 857–58 (Bankr. N.D. Ill. 1989) ("The determination whether a creditor's security interest encompasses property acquired after the date of the security agreement, is governed by the intent of the parties..."). This demonstrates the parties' intent Appellants have a security interest in the future accounts receivable they purchased.

Similarly, the collateral descriptions in the UCC Financing Statements, which were outlined on Page 3, FN 4 of the Opinion, also identify an interest in after-acquired property. Both state the collateral includes payment rights that arise "after the date of the agreement."

Even more important for the purposes of this case however is that Appellants' interests in future accounts receivable did not cut off under 11 U.S.C. §552(a). Their security interests in the future accounts receivable they purchased is not even subject to 11 U.S.C. §552(a). Section 552(a) of the Bankruptcy Code, by its plain language, governs only security interests that were created by a security agreement. 11 U.S.C. §552(a) ("property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."). Appellants' security interests in the property they purchased did not arise via a security agreement. The security interests arose automatically. This is because a sale of accounts receivable automatically falls within Article 9 of the Uniform Commercial Code and no specific

grant of a security interest nor a security agreement was required for Appellants to have a security interest in the future accounts receivables they purchased from Appellee. *See* U.C.C. § 9-109(a)(3) (explicitly stating that Article 9 applies to "a sale of accounts, chattel paper, payment intangibles, or promissory notes"); *see also, e.g., In re Level 8 Apparel, LLC*, No. 16-13164 (JLG), 2024 WL 3379539, at *22 (Bankr. S.D.N.Y. July 11, 2024) ("the provisions of article nine of the U.C.C. explicitly encompass both sales of accounts receivable and security interests in receivables. ... the U.C.C. defines a 'security interest' as 'any interest of a buyer of accounts.' Thus, 'even an outright buyer of accounts ... by definition has a 'security interest' in the accounts which it purchases.").

This is why a determination of whether the transactions were true sales was so important to Appellants. If the transactions are true sales as Appellants contend, Appellants rights would not cut off, as demonstrated by, for example, *In re R&J Pizza Corp*., and they would be entitled to the full benefit of their bargain. On the other hand, if the transactions are merely loans, their interests would cut off on the date the bankruptcy case was filed under 11 U.S.C. §552(a) and, in this particular case, due to the valuation of the accounts receivable under 11 U.S.C. §506, they would have nothing more than unsecured claims.

Throughout its Opinion, the Bankruptcy Court incorrectly assumed that Section 552(a) of the Bankruptcy Code is applicable when it clearly is not if the

transactions are true sales as the Appellants assert their transactions with Appellee are. A connection to pre-petition property and proceeds is simply not necessary to have an interest post-petition when the transaction is a true sale because, again, the purchaser's interests do not cut off.

## IV. **The Bankruptcy Court Erred in Concluding the Transactions Between Appellants and Appellee Were Loans**

The Bankruptcy Court erred because it failed to apply governing law when it analyzed whether the transactions were sales or loans. While the Bankruptcy Court found that the Agreements are governed by Florida law, *see* Opinion at pg. 19, ¶2, ("…Overton's…which is governed by Florida law…."), pg. 23, ¶2 ("…the Fox Agreement is governed by Florida law…." p. 23 ¶ 2), the Bankruptcy Court largely ignored Florida law, instead relying on inapplicable New York law. *See Id*. at pg. 19 (*citing In re McKenzie Contracting, LLC*, 2024 WL 3508375, at *2, which adopts the test applied by New York courts in *LG Funding, LLC v. United Senior Props. Of Olathe, LLC*, 122 N.Y.S.3d 309 (N.Y.A.D. 2 Dept. 2020)), pg. 22 (*citing In re Glob. Energy Servs.*, No. 21-17305-NVA, 2025 WL 1012721 (Bankr. D. Md. Mar. 31, 2025), which adopted *LG Funding*, and actually determined the agreement was a sale of future receipts), and pg. 22 (*citing Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*, No. 16-CV-2696 (ILG) (E.D.N.Y. July 6, 2017), which relied entirely on New York law).

To be sure, even under the case law relied upon by the Bankruptcy Court—and the New York body of law governing sales of future accounts receivable, including the case law cited by the Bankruptcy Court—the Fox Agreement and Overton Agreement, if correctly analyzed, are clearly valid agreements for the purchase and sale of future receivables, not loans.[5] Regardless, had the Bankruptcy

[5] To the extent New York law is persuasive, it is clear that the agreements pass all three of the factors cited by New York Courts. *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885-CV, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023) ("New York courts usually weigh three factors in making that determination: '(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.'") (quoting *Principis Cap., LLC v. I Do, Inc.*, 160 N.Y.S.3d 325, 326–27 (N.Y.A.D. 2 Dept. 2022)). Specifically, the agreements each contain clear and mandatory adjustment provisions to make the weekly remittances more closely match the specified percentages sold, clearly call for indefinite terms inasmuch as the remittance amounts are subject to adjustment in the event of a diminution in receivables, and neither agreement gives recourse for the mere filing of bankruptcy. Indeed, because there is no evidence in the record that the Appellee ever "engage[d] in the agreement's reconciliation procedure, [the court's] review of the claim that the process was illusory is precluded." *Apollo Funding Co. v. Dave Reilly Constr., LLC*, 242 N.Y.S.3d 86, 88 (N.Y.A.D. 2 Dept. 2025); *accord US Info. Grp. LLC v. EBF Holdings, LLC*, No. 22-CV-6661 (PKC), 2023 WL 6198803, at *7–8 (S.D.N.Y. Sept. 22, 2023); *Streamlined Consultants, Inc. v. EBF Holdings*, LLC, No. 21-CV-9528 (KMK), 2022 WL 4368114, at *4 (S.D.N.Y. Sept. 20, 2022). Moreover, the agreements specifically contain provisions that "Merchant going bankrupt, going out of business, or experiencing a slowdown in business or a delay in collecting its receivables, in and of themselves, do not constitute a breach of this Agreement" and that the funder "agrees to purchase the Receipts knowing the risks that Merchant's business may slow down, go bankrupt or fail." New York courts have repeatedly held such provisions definitively show a contingent purchase of receivables. *Bridge Funding Cap LLC v. SimonExpress Pizza, LLC*, 240 A.D.3d 1186, 1189 (N.Y.A.D. 4 Dept. 2025); *Samson MCA LLC v. Joseph A. Russo M.D. P.C.*, 219 A.D.3d 1126, 1128 (N.Y.A.D. 4 Dept. 2023). For these reasons, New York courts have repeatedly held that materially similar agreements to the agreements

Court properly analyzed the Overton and Fox Agreements under the governing Florida law, it would have undoubtedly been compelled to reach a different conclusion. Indeed, as explained in greater detail below, the law and analysis the Bankruptcy Court should have applied establishes that the agreements at issue are not loans, but rather enforceable purchase and sale agreements.

### *A. Under Florida Law, Speculative Contracts Fall Outside the Gamut of Loans and Usury*

Transactions in which a portion of the investment is at speculative risk are not loans and therefore excluded from loan and usury statutes. *Hurley V. Slingerland*, 461 So.2d 282, 284 (Fla. 4th DCA 1985); *Singhal v. Unison Agreement Corp.*, No. 22-60656-CIV, 2023 WL 2734230, at *4 (S.D. Fla. Mar. 31, 2023) ("Earnings on an advance of money that is placed at speculative risk are typically not subject to Florida's usury statutes."). "Florida precedent and the case law on which the Florida

---

here are not loans as a matter of law. *E.g.*, *Fox Capital Grp., Inc. v. Relik Realty, LLC*, 2023 N.Y. Slip Op. 32444(U), 7 (N.Y. Sup. Ct. 2023); *Fox Capital Grp., Inc. v. F J Trucking*, 2022 N.Y. Misc. LEXIS 87524, at *4-5 (N.Y. Sup. Ct. 2022); *OT Aspekt & Chiropractic PLLC v. Fox Cap. Grp., Inc.*, 154 N.Y.S.3d 217 (N.Y. Sup. Ct. 2021); *accord In re McKenzie Contracting, LLC*, 2024 WL 3508375, at *5-6 ("First, the MCA agreement contains a reconciliation provision that provides that either party may request a reconciliation at any time. Second, the MCA agreement provides that it does not have a fixed time for repayment. Third, the MCA agreement does not state that filing for bankruptcy would trigger a default of the agreement. … Under the Fox MCA agreement filed with its proof of claim, Fox assumes the risk of non-payment, and Fox is not absolutely entitled to repayment under all circumstances.") (applying New York law). If New York law governs, the Bankruptcy Court has clearly erred in its application to the agreements in this case.

precedent was based establishes that there must be a substantial risk, i.e., a chance of losing one's whole investment, in order for a financing transaction to be exempted from the usury statute." *Beausejour Corp., N.V. v. Offshore Dev. Co.*, 802 F.2d 1319, 1322 (11th Cir. 1986) (citing cases). When the principal sum or any part of it is placed in hazard, the party assuming the risks may lawfully require in return for the risks as large a sum as may be reasonable provided it is done in good faith. *Diversified Enters., Inc. v. West*, 141 So.22, 27, 30 (Fla. 2d DCA 1962). "A defendant alleging usury as an affirmative defense, in order to avoid or defeat an obligation to pay money, must establish his charge by clear and satisfactory evidence. For the defense of usury to be established, the circumstances surrounding the entire agreement must be proved, and they must be carefully scrutinized by the court." *Id.*

Parole evidence is inadmissible in this instance to determine the intent of the parties because the contract is clear and unambiguous. *See Summit Consulting, Inc. v. J.J. Walsh Construction, Inc.*, 568 So.2d 1290 (Fla. 2d DCA 1990). The Court when reviewing contracts must also make interpretations based upon the language forming the contract.

The written instruments are clearly drafted and completely unambiguous about its intention to place Appellants' investment at risk by making Appellee's

remittance obligation contingent upon the actual collection of receivables and good faith operation of the underlying business venture.

*B. Under Florida Law, the Fox Agreement and Overton Are Undoubtedly Sales and Not Loans*

The Bankruptcy Court found that the Fox Agreement and Overton Agreement are loans, subject to usury laws, however, well-settled, and binding, Florida law compels a different conclusion. For instance, *Craton Entm't, LLC v. Merch. Capital Grp. LLC*,, 314 So. 3d 627 (Fla. Dist. Ct. App. 2021) *rehearing denied* 2021 Fla. App. LEXIS 9128 (Fla. 3d DCA 2021), is the only Florida appellate authority to consider whether a future receivables purchase agreement is a loan or purchase of receivables, held in favor of the purchaser. The Third District Court of Appeal affirmed a ruling of the Circuit Court for Miami-Dade County holding that an agreement for the purchase of a business' future receivables fell outside the scope of loans and therefore usury statutes are not applicable. *Id.* The gravamen of the Court of Appeal's ruling was that the obligation was not absolute, but rather contingent or dependent upon the success of the underlying venture. *See Id*. The opinion is stated in full below,

> Affirmed. *See Saralegui v. Sacher, Zelman, Van Sant Paul, Beily, Hartman & Waldman, P.A.*, 19 So. 3d 1048, 1051 (Fla. 3d DCA 2009) (reasoning that transaction is not indicative of a loan where repayment obligation is not absolute, but rather contingent or dependent upon the success of the underlying venture); *Oregrund Ltd. P'ship v. Sheive*, 873 So. 2d 451, 456 (Fla. 5th DCA 2004) (observing that 'transactions in which a portion of the investment is at speculative risk' are 'excluded

> from the usury statues'); *Hurley v. Slingerland*, 461 So. 2d 282, 284 (Fla. 4th DCA 1985) (holding that where a 'portion of appellee's investment was at risk…the transaction was not usurious'); *Diversified Enters., Inc. v. West*, 141 So. 2d 27, 30 (Fla. 2d DCA 1962) ('When the principal sum lent or any part of it is placed in hazard, the lender may lawfully require, in return for the risk, as large a sum as may be reasonable, provided it is done in good faith.').

*Id.* Of course, "[a]bsent a decision by the highest state court or persuasive indication that it would decide the issue differently, [federal courts] follow the decisions of intermediate appellate courts in applying state law." *Royal Palm Vill. Residents, Inc. v. Slider*, 57 F.4th 960, 965 (11th Cir. 2023) (citation and quotation marks omitted).

A plethora of Florida courts have agreed that agreements structured as receivables purchase agreements, such as the two at issue, are not loans and do not implicate usury, as supported by many rulings from Florida courts upholding the validity and enforceability of these agreements as purchase and sale agreements not loans. *See ,e.g.*, *Order Granting Summary Judgment in Fox Capital Group, Inc. v. Crownland, LLC, et al* (Casey, J.); *Order on Plaintiff's Motion to Strike Affirmative Defenses and Plaintiff's Motion to Dismiss Counterclaims in Fox Funding Group LLC v. Frank's Air Conditioning, Inc., et al*, CACE-25-007337 ("1. Defendant's First and Second Affirmative Defenses are STRICKEN WITH PREJUDICE. The Parties' Agreement is not a loan, but rather a Future Receivable Sale and Purchase Agreement and therefore usury laws are not implicated or applicable….4. COUNT ONE of Defendants' Counterclaim is DISMISSED WITH PREJUDICE. The Parties

Agreement is not a loan, but rather a Future Receivable Sale and Purchase Agreement and therefore usury laws are not implicated or applicable.") (Towbin Singer, J.).[6]

In a notable decision in *Fox Funding Group LLC v. Five Star Appliances, Inc., et al*, the court in granting summary judgment in favor of Fox analyzed a similar, if not identical, agreement to the Fox Agreement accordingly:

> IT IS HEREBY ORDERED and ADJUDGED that Plaintiff's Motion for Summary Judgment is GRANTED and the Court makes the following finding of facts:
>
> (1) the Parties entered into a lawful, enforceable, and binding written contract for the purchase and sale of an equity interest in Company Defendants', Five Star Appliances, Inc.'s., future receivables with a

[6] *See also Final Summary Judgments in Fox Capital Group, Inc. v. Crownland Investments LLC*, CACE-22-014532; *Instafunders LLC v. Orange Coast Hospice, Inc.*, CACE-22-017809; *Fox Capital Group, Inc. v. Gaskins Coating, Inc.*, COSO-22-006517; *Fox Capital Group, Inc. v. Imexco Industrial Parts*, CACE-23-000160; *Fox Capital Group, Inc. v. Frontline Roofing, Inc.*, CACE-23-002804; *Fox Capital Group v. Danny R. Phelps, Jr*, CACE-23-014903; *Unique Funding Solutions LLC v. Richard James Smith, Jr.*, CACE-24-010564; *Fox Capital Group, Inc. v. Superior Drywall Builders, et al*, CACE-24-009485; *Mynt Advance v. Parent Support Network of Rhode Island, Inc., et al*, CACE-24-011159; *Unique Funding Solutions LLC v. Licona's Enterprise Corp, et al*, CACE-24-014630; *Fox Capital Group, Inc. v. Robert Meacham*, COSO-23-001485; *Fox Capital Group, Inc. v. Marky Drops LLC*, COSO-23-000203; *Fox Capital Group, Inc. v. Robert Meacham*, COSO-23-001485; *Fox Capital Group, Inc. v. Reserve Transfer Inc*, COSO-23-005682; *Fox Capital Group v. Vits Vision Care, LLC*, COSO-23-006742; *Fox Capital Group, Inc. v. Al Smith MC James Smith, LLC*, COSO-23-005029; *Fox Capital Group, Inc. v. Dreki Enterprises, Inc.*, COSO-23-004488; *Fox Capital Group v. Times with Tots, Inc.*, COSO-23-005430; *Fox Capital Group, Inc. v. Pittsburgh Steel Processing, LLC, et al*, COSO-24-018614; *Fox Funding Group LLC v. Five Star Appliances, Inc., et al*, COCE-24-072471.

personal guaranty of performance executed by Defendant Ziad M Affaneh (the ‘Agreement’);

(2) the Parties Agreement is a purchase and sale agreement for future receivables, not a loan, and does not operate as a loan for the following reasons:

(a) in contrast to a loan which has a definitive/fixed term date or a date of maturity for repayment, payments by the Merchant/Defendants under the Agreement is not absolute but rather speculative with an indefinite term contingent or dependent upon the Merchant’s generation of revenue and the success of the underlying venture;

(b) in contrast to a loan which has interest charges, the Agreement does not include any interest charges;

(c) in contrast to a loan where the repayment obligation is absolute, the Agreement does not have an absolute repayment obligation and the Plaintiff has placed the principal sum in hazard and assumed such material risk;

(d) in contrast to a loan where there is a borrower who borrows money from a lender, in the Agreement the Merchant is selling a portion of a business’ future stream of revenue at a discount to a funder for an initial cash influx to the Merchant;

(e) in contrast to loan which has scheduled payments of a fixed amount, the Agreement has provisions for mandatory reconciliation and adjustments tied to and dependent upon the generation of revenue and the success or failure of the underlying business venture;

(f) the Agreement is unambiguously titled “FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT”;

(g) the Agreement explicitly states “THIS IS NOT A LOAN. Merchant is selling a portion of a future revenue stream to FFG at a discount, not borrowing money from FFG.”;

(3) Since the Agreement is not a loan (as per the reasons listed above), usury laws are not implicated or applicable;

(4) Plaintiff fully performed under the Agreement;

(5) Defendants' breached the Agreement;

(6) Defendant, Ziad M Affaneh, is liable for damages under the Agreement as a guarantor; and

(7) Plaintiff is entitled to damages.

COCE-24-072471, (Aug. 13, 2025) (Benson, J.) (Footnotes omitted).

Furthermore, while the Bankruptcy Court focused on what other courts and jurisdictions have considered (*see*, *e.g.*, Opinion, p. 15), it is notable that many of those cases generally relied on an older law review article, rather than positive state law. *See In re Shoot The Moon, LLC*, 635 B.R. 797, 813 (Bankr. D. Mont. 2021) (citing Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L.J. 181, 186-94 (1991)); *In re Watchmen Sec. LLC*, No. 24-00087-JMC-11, 2024 WL 4903363, at *6 (Bankr. S.D. Ind. Nov. 20, 2024) (relying on *Shoot the Moon*).

Moreover, it is well-settled that Florida courts emphasize; (a) the good faith intention of the parties when entering into the agreement, as evidenced by the words within the four corners of the agreement, and (b) the risk of loss of capital, as indicative of a transaction that is not a loan and that is exempt from usury. *Diversified Enters.*, 141 So.22 at 30. Parol evidence is inadmissible to determine the intent of the parties when the contract is unambiguous, as they are here. *Summit Consulting, Inc.*, 569 So.2d 1290. Therefore, since the agreement is not a loan, usury does not

attach, and it is enforceable up to the amount bargained for by the parties, as "[t]he law is well settled that usury can only attach to a loan of money…" *Davidson v. Davis*, 56 Fla. 476, 478 (Fla. 1910). Here, the terms of the parties' Agreements are clear and unambiguous and should have been upheld in the same manner that Florida courts have regularly upheld similar agreements for the sale and purchase of receivables.

In fact, in analyzing contracts such as those at issue under Florida law, courts in other states as well have upheld them as agreements for the purchase or future receivables, and not loans. *See e.g., Official Comm. Of Unsecured Creditors v. EBF Partners, LLC (In re Cornerstone Tower Servs.)*, 2019 Bankr. LEXIS 6, at *10-17 (Bankr. D Neb. Jan. 3, 2019, Nos. BK16-40787, A17-4050) (finding that an agreement governed by Florida law was not a loan, but rather a sale of receivables as, amongst other facts, "the document clearly states it was a sale and not a loan"); *See also In re Assist-Med, Inc.*, 2017 Bankr. LEXIS 4062, at *7-8 (Bankr. SD Tex. Nov. 27, 2017 No. 16-31624-H5-11) (applying Florida law and finding that the subject contract which "unambiguously identifies the transaction as a sale of accounts receivable and disclaims the possibility of construing the sale as a loan…is a sale of accounts receivable, rather than a loan"); *Fox Capital Group, Inc. v. LE Corporation, et al*, LACV2107129 (Order Granting Plaintiff's Motion for Summary Judgment) (Iowa Dis. Cr. Woodbury Co., 2024) (Tott, C.J.) (analyzing Florida law

and ruling that an almost identical contract was a true purchase and sale agreement, and not a loan).

Notably, a Florida statute passed in 2023, before the Agreements were entered into, has made clear that the parties' designation of a contract as one for a purchase of receivables should be presumed correct rather than recharacterizing it as a loan. *See e.g.*, § 559.9611, Fla. Stat. Ann. ("For purposes of this part, the provider's characterization of an accounts receivable purchase transaction as a purchase *is conclusive that the accounts receivable purchase transaction is not a loan or a transaction for the use, forbearance, or detention of money*") (emphasis added). While the Bankruptcy Court discounted this argument because of the prefatory language, "[f]or purposes of this part" (Opinion at p. 23), the statute nonetheless unequivocally demonstrates the Florida legislature's endorsement of receivable sales-based financing as an alternative form of financing, which will not be deemed a loan where otherwise designated and structured by the parties.

Thus, the Bankruptcy Court erred in failing to properly consider Florida law, under which the Agreements are undoubtedly enforceable purchases of receivables.

i. <u>The Fox Agreement</u>

In addition to failing to properly consider the governing law, the Bankruptcy Court also incorrectly analyzed the actual terms and provisions of the parties' Agreements.

#### a. *The Fox Agreement's clear language demonstrates a good faith and explicit intent to enter into a speculative purchase and sale agreement*

The Fox Agreement (i) is unambiguously titled "FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT," (ii) explicitly states that "THIS IS NOT A LOAN. Merchant is selling a portion of a future revenue stream to FFG at a discount, not borrowing money from FFG," (iii) provides that "Merchant going bankrupt, going out of business, or experiencing a slowdown in business or a delay in collecting its receivables, in and of themselves, do not constitute a breach of this Agreement," and (iv) includes Fox's disclaimer that it entered into the Agreement "…knowing the risk that Merchant's business may slow down or fail." (adding that Fox "…assumes these risks…"). *See* Fox Agreement, p. 1. Thus, Fox's good faith intent to accept and partake in the speculative risk of Appellee's business performance is seen in multiple provisions. *See McKenzie Contracting*, 2024 WL 3508375, at *6 (emphasizing how this very language demonstrates that "Fox assumes the risk of non-payment, and Fox is not absolutely entitled to repayment under all circumstances.").

Section 2.14 of the Fox Agreement establishes that Fox assumes the risk of a downturn, with the expectation of good faith operations of the business. Explicitly, the Fox Agreement states that bankruptcy, business closure or slowdown does not constitute a breach, with Fox expressly acknowledging these risks (p. 1, para 2).

Section 1.9.2 further confirms that the sale of receipts is without recourse if business receipts are not generated. Section 2.6 and 5.1 memorializes that Appellee may close the business under uncontrollable circumstances, and the guarantor's liability is contingent on good faith efforts to honor obligations, rather than guaranteeing absolute payment.

To clarify, the guarantor is guaranteeing the good faith performance by Appellee to fulfill its obligations. Contrary to the Bankruptcy Court's Opinion, the guarantor would only be liable for damages caused by a default under the Fox Agreement if a breach of a guaranteed obligation were to occur. However, if, for example, the Appellee merely filed for bankruptcy, without defaulting under the Fox Agreement, the guarantor faces no liability whatsoever since a downturn of the business profits or filing for bankruptcy by themselves are not events of default, and conversely, Fox expressly bore the risk of such losses. Together, all these provisions explicitly affirm both parties' acknowledgment of Fox's serious assumption of risk, and good faith intent to enter into what is undoubtedly a purchase and sale transaction. *See McKenzie Contracting*, 2024 WL 3508375, at *5-6.

*b. Unlike a loan, payments are adjustable with no maturity date or interest rate.*

Pursuant to the Fox Agreement's clear and unambiguous terms, it is plainly not a loan. There is no date of maturity, and no annual interest rate, and as stated at

the very beginning in Section 1.1, "This Agreement for the purchase and sale of future receipts does not have a fixed duration or term, making the term potentially infinite." The explicit intention to leave the duration of performance open-ended makes it undeniable that the Fox Agreement is intended to be distinguishable from a loan in a material and dispositive way. The very first page of the Agreement memorializes the Parties' intent in capital letters by stating "THIS IS NOT A LOAN." Fox clearly undertook the risk that it would lose all or part of its investment if Apellee failed to generate receivables.

Additionally, Section 1.9.2 clarifies that the purchase is made "…without express and implied warranty to [Fox] of collectability of Receipts and without recourse against Merchant, any Owner or any Guarantor if Receipts are not generated in the regular course of Merchant's business operations or cannot be collected…." This explicit assumption of risk distinguishes the Agreement from a loan, where repayment is absolute and fixed. The Fox Agreement also acknowledges scenarios where Appellee's obligations <u>may cease entirely</u>, such as business closure, "[a]s an extreme example, in the event Merchant's business ceases to exist after FFG's purchase of the Receipts and prior to the delivery of the Purchased Amount as a result of a cessation of revenues for reasons outside Merchant's control, FFG may never collect all or a substantial portion of the Purchased Amount." These explicit provisions are not mere dressing to disguise a loan, as the Bankruptcy Court

concluded without evidence, rather the entire makeup, structure, essence, and mechanics of the Agreement operates entirely differently than a loan and its name is true to the product.

The adjustment and reconciliation provisions (Section 1.4 and 1.5) highlight the contingent and adaptable nature of the Fox Agreement, further distinguishing it from a loan. The Fox Agreement provides for mandatory adjustments and reconciliations to occur if requested by the seller, at a frequency chosen by the seller, to result in a reset of the payments to Plaintiff to conform it to the product of the purchased percentage and the seller's actual Receipts. The Fox Agreement states, "…Merchant shall have the right to request a reconciliation….Merchant may request an adjustment at any time and for as many times as it desires during the course of the Agreement by sending FFG a request….The reconciliation shall be made within five (5) business days of Merchant's request and provision of the financial information described in this Section….Any reconciliation may substantially extend the duration of this Agreement….Nothing set forth in Section 1.5 shall be deemed to prevent Merchant from requesting a stop or reduction to the Daily Remittances in the event of a material reduction or cessation of its Receipts." The language of the agreement, is unambiguous as to Fox's mandatory obligation to reconcile where Appellee properly documents a change in its collections of receivables. The requirement places a reasonable condition precedent upon Appellee, to in good faith

produce recent bank documentation for Fox to reliably calculate the value of the receivables collected by Appellee, ensuring that if there has been any diminution in receivables volume that resulted in overcollection by Fox beyond the specified percentage, Fox will credit those amounts back to the Appellee.

Similarly, the adjustment provisions provides the mechanisms by which either party may give notice to the other for and adjustment of the remittance amount to more accurately reflect the purchased percentage of receivables. *See* Fox Agreement, § 1.4. These provisions demonstrate that the Appellee was not required to make fixed or guaranteed payments but instead only remit amounts proportional to their actual receipts, with the Fox Agreement explicitly anticipating fluctuations in collections. The indefinite term, reconciliation mechanism, adjustment mechanism, and express acknowledgement of risk in the event of bankruptcy or a downturn of the business's performance, collectively affirm that Fox assumed significant material risks of total loss of its investment, in line with a receivables purchase agreement, and unlike a loan, which imposes absolute repayment regardless of economic conditions.

*c. The Bankruptcy Court's analysis is improper and should be overruled.*

The Bankruptcy Court's analysis is contrary to both Florida law and the explicit terms of the Agreements. In fact, the Bankruptcy Court's Opinion runs opposite the decision reached by the Third District Court in *Craton*. The Bankruptcy Court admits to an indefinite term, but then incorrectly rationalizes that the Appellee

would not be afforded an opportunity to request reconciliation and does not transfer risk to Fox. This is the wrong result under Florida law.

Regarding reconciliation, the Bankruptcy Court states with the benefit of hindsight "[t]here is a better than average chance [Appellee] was in default of several covenants upon executing the Fox Agreement." *See* Opinion at p. 26 ¶ 4. Another way of saying that is Fox, was defrauded from the onset by the Appellee as Fox alleges in the adversary proceeding. However, at the time of execution, and pursuant to the terms accepted, Fox was unaware of this fraud by Appellee, and it is no basis for the Bankruptcy Court to presume that Fox would not have honored the binding reconciliation request.

Regardless, when reviewing an agreement, terms, and legality, the Bankruptcy Court cannot base its analysis on knowledge which the parties did not have and would only learn later. Furthermore, certainly, the Bankruptcy Court should not use Appellee's own fraudulent misrepresentations to excuse their obligations under the lawful and binding Agreements.

Additionally, it is important to consider the underlying agreements in *Craton*, wherein the Appellee was allowed to request reconciliation once a month. Here, the reconciliation provision is even stronger, as Appellee was allowed to request reconciliation whenever, and how many times, as they wanted. Essentially, the Bankruptcy Court found these Agreements to be unenforceable, though they

contrary to the binding decision in *Craton*, concerning Agreements with weaker reconciliation provisions than the ones in the Agreements here. Applying the Bankruptcy Court's analysis to the agreements in *Craton*, would lead to the finding that the agreements *Craton* are disguised loans, solely because a default could occur before having the opportunity to reconcile.

The Bankruptcy Court concluded that there is no transfer of risk because of the performance guaranty. However, in so finding, the Bankruptcy Court overlooked key language of the performance guaranty that makes it explicitly clear that there was not a guarantee of payment.

As noted therein, the Performance Guaranty provides, "[f]or avoidance of doubt, this Guaranty is made for the purpose of securing performance of Merchant obligations to FFG and, (i) no guarantor shall be liable to remit the Purchased Amount in the event that Merchant itself is not required to do so, such as for the reasons set forth in Section 1.9.2. of this Agreement, and (ii) this Guaranty does not otherwise affect the contingent nature of this transaction." *See* Fox Agreement at p. 11 § 5.1 (emphasis added). In analyzing the Agreement, the Bankruptcy Court ignored this explicit language that requires a conclusion inconsistent with the Bankruptcy Court's opinion.

Contrary to the conclusion that the guaranty in the Fox Agreement places all risk of default upon the guarantor, Dr. Nichols, in fact, the guaranty is contingent

upon the generation and good faith performance of the business. To claim that Appellants carried little to no risk of loss is unsupported by law or the facts – to the contrary, the language in the Agreement explicitly contradicts such a notion. The guaranty when read in its entirety and all provisions given full weight and the respect they are owed, establishes that Fox, took the significant risk of its principal amount, placing it in hazard and hoping the Appellee's business would in fact be successful.

ii. The Overton Agreement

*a. The Overton Agreement's clear language similarly demonstrates a good faith and explicit intent to enter into a speculative purchase and sale agreement, not a loan.*

As with the Fox Agreement, the terms of the Overton Agreement contemplated an exchange of risk and reward in return for the good faith operation of the business. The first page of the Overton Agreement unambiguously describes the practical aspect of achieving its goals. The intent is to create a good faith base-line payment, the "Initial Estimated Payment" which is an estimated dollar amount of the purchased percentage of the receivables based upon representations by Appellee to Overton:

> This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.

*See* Overton Agreement at p. 1. The Overton Agreement memorializes the parties' intent in Section 14 by unambiguously stating that Appellants had explicitly assumed the risk of Appellee's business failing:

> Each Merchant and OVERTON agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from OVERTON to any Merchant. OVERTON is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in OVERON not receiving the Receivables Purchased Amount. Any Merchant going bankrupt, going out of business, or experiencing a slowdown in business or a delay in collection Receivables will not on its own without anything more be considered a breach of this Agreement.

*Id*. at p. 4 § 14

The assumption of risk is meaningful, because there is no prohibition on the closure or failure of the business, declaration of bankruptcy, diminishing business performance, or delay in collection of receivables. The Financial Condition and Financial Information covenant found in Section 20 states that Appellee, IVF Orlando, took upon itself "…a continuing affirmative obligation to advise OVERTON of any material adverse change in its financial condition, operation, or ownership that may have an effect on any Merchant's ability to generate Receivables or perform its obligations under this Agreement." *Id*. at p. 6 § 20.

Similarly, it is made explicit in Sections G1 and G2 that Appellant's recovery against the guarantor is not intended to be absolute, and Overton assumes the risk of

loss upon the condition that guarantor ensures that Appellee honors its covenants to Overton *other than for payment*:

> This is a personal guaranty of performance…Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant…(the 'Guaranteed Obligations'). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

*Id*. at p. 12 § G1 (emphasis added).

> If any Event of Default has taken place under the Agreement, then OVERTON may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant…

*Id*. at p. 12 § G2. The existence of the guaranty of performance (and not an absolute guaranty) shows that Overton merely expected the owner of the business entity to accept personal accountability for ensuring his company's ongoing compliance with its obligations to Overton, similar to a "bad boy" guaranty. However, nothing in the guaranty gives Overton the right to seek anything more than a guaranty on the Appellee's performance under the terms of the Agreement and only in an underlying event of default. The obvious intent of the foregoing language is to create a transactional relationship based upon an obligation to run the business in good faith and communicate about the health of the business, not an absolute obligation to deliver receivables on a schedule.

*b. Unlike a loan, payments are adjustable with no maturity date or interest rate.*

Plainly, the Overton Agreement is not structured in the form of a loan. There is no date of maturity, no applicable interest, and there is a reconciliation mechanism making the potential term of the agreement indefinite.

These provisions were not illusory, but rather mandatory and guided the whole nature of the parties' arrangement. The intention to leave the duration of performance open-ended compels the conclusion that the Overton Agreement is distinguishable from a loan in a meaningful way. As set forth therein, "Merchant and OVERTON agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from OVERTON to any Merchant." *See* Overton Agreement at p. 4 § 14.

The first page unambiguously describes the practical aspects of valuing Appellee's obligations to Overton as contingent upon market conditions. At the time of signing, the "Initial Estimated Payment" is set based upon the specified percentage of the Appellee's recent receivables collections reflected in its bank statements. Thereafter, the agreed upon process to have the "Initial Estimated Payment" adjusted to changing collections merely requires a written request and submission of documentary proof by Appellee of its recent receipts to Overton, which would then be mandated to adjust the weekly remittances to reflect

fluctuations in receivables. This process is described clearly and unambiguously in the Overton Agreement which states, in relevant part:

> ….A request for reconciliation by any Merchant must be made by giving written notice of the request to OVERTON or by sending an e-mail to…stating that a reconciliation is being requested. In or to effectuate the reconciliation, any Merchant must produce with its request any and all statements covering the period from the date of this Agreement through the date of the request for a reconciliation….OVERTON will complete each reconciliation requested by any Merchant within two business days after receipt of proper notice of a request for one accompanied by the information and documents required for it.

*Id*. at pp. 2-3 § 4.

Furthermore, the explicit language providing that, "OVERTON will credit to the Account all amounts to which OVERTON was not entitled…" is unambiguous as to the Appellant's mandatory obligation to reconcile when Appellee documents a change in the market. Thus, the language of the Agreement is unambiguous about its intent to provide a practicable format for the parties to achieve the goal of delivering the specific percentage of receivables.

*c. The Bankruptcy Court's analysis is also equally improper and should be overruled.*

Here too, the Bankruptcy Court's analysis of the Overton Agreement is contrary to Florida law and runs in contrast to the decision reached in *Craton*, mirroring the analysis applied above in the Fox Agreement. The Bankruptcy Court conceded the Overton Agreement contains an indefinite term, a meaningful

reconciliation provision, but surprisingly decides that it does not transfer risk to Overton based on the guaranty. This is the wrong result under Florida law for several reasons.

First, the Bankruptcy Court utilized the Appellee's breaches of the Overton Agreement, and their fraudulent misrepresentations to Overton, to allow Appellee to escape their contractual obligations. It is strange that the Bankruptcy Court would conclude that Appellee's bad conduct in misrepresenting certain terms militates in Appellee's favor such that the agreement cannot be enforced.

Second, the Bankruptcy Court relies <u>entirely</u> on decisions based upon New York law. This alone should be grounds for reversal of the Bankruptcy Court's decision.

Third, the result reached by the Bankruptcy Court is contrary to Florida law. Indeed, under the Bankruptcy Court's framework, the agreements and performance guarantees in *Craton* would also "…easily qualify as a loan transaction[s] when evaluating the transfer of risk…". As such, the Bankruptcy Court's Opinion is in disregard to the binding (under Florida law) Third District Court of Appeal decision.

The performance guarantee in *Craton* included a guarantee of performance and payment as well as confession of judgment wherein the seller of receivables and guarantor allowed the appellant to enter judgment immediately upon breach of the underlying agreement and without notice. Nonetheless, the Third District Court of

Appeal found the agreement enforceable because, as here, payments was contingent upon the actual collection of receivables.

Additionally, contrary to the Bankruptcy Court's assertion otherwise, Overton has taken on meaningful risk as to the amount paid by it for Appellee's receivables, by placing not just a portion, but its entire principle sum that it funded to Appellee in hazard hoping Appellee would be successful in its future business and making remittances contingent upon the success of the underlying venture.

For all the foregoing reasons, the Overton Agreement clearly shows that it took a speculative risk rather than loaning money to Appellee. It is well-settled under Florida law that "transactions in which a portion of the investment is at speculative risk," such as the agreement at issue, are not loans and are "excluded from usury statutes." *See Oregrund Ltd. P'ship v. Sheive*, 873 So. 2d 451, 456 (Fla. 5th DCA 2004).

## V. **The Bankruptcy Court Erred When It Confirmed the Plan Because: (I) Appellee Did Not Meet Its Burden of Proving the Plan Should be Confirmed, (II) the Court Did Not Ensure That all Elements of Section 1129(a) Were Met and (III) all Elements of Section 1129(a) Were Not Met**

Section 1129(a) of the Bankruptcy Code sets forth each element a plan proponent must establish to confirm a Chapter 11 Plan. *In re Walden Palms Condominium Association, Inc.*, 625 B.R. 543, 548 (Bankr. M.D. Fla. 2020); *In re Piper Aircraft Corp.,* 244 F.3d 1289, 1299 (11th Cir. 2001). "All sixteen requirements must be met, unless 1129(b) applies. For example, the proponent must

show the plan has been proposed in good faith and not forbidden by law, the plan identifies the debtor's directors and officers to serve after confirmation and their appointment or continuance in such office follows public policy, and that the plan is feasible." *In re Walden Palms Condominium Association, Inc*., 625 B.R. at 548. "The bankruptcy court has an independent duty to ensure each element under §1129(a) is met, even if nobody objects or creditors have voted to accept the plan." *Id*. at 548 -549; *see also*, *In re Piper Aircraft Corp*., 244 F.3d at 1299-1300 n. 4 ("A court must independently satisfy itself that these criteria in § 1129 are met. Thus, it must consider facts relating to these criteria even in the absence of an objection."); *In re Lett*, 632 F.3d 1216, 1229 (11th Cir. 2011). "The plan proponent must prove each element by a preponderance of the evidence." *In re Immenhausen Corp*., 172 B.R. 343, 347 (Bankr. M.D. Fla. 1994) ("It should be noted at the outset that in order to confirm a plan of reorganization, a debtor has the burden of proof as to each element of § 1129(a) of the Bankruptcy Code.").

Courts within the Eleventh Circuit have generally applied a preponderance of the evidence standard for plan confirmation proceedings. In *In re Celotex Corp.*, the court stated, in relevant part: "The plan proponents bear the burden of proving the elements of 11 U.S.C. § 1129(a) by a preponderance of the evidence." *In re Celotex Corp*., 204 B.R. 586 (M.D. Fla. 1996); *In re J.C. Householder Land Trust #1*, 501

B.R. 441 (M.D. Fla. 2013); *In re Monticello Realty Investments, LLC*, 526 B.R. 902, 912 (M.D. Fla. 2015); *In re Stein Mart, Inc.*, 629 B.R. 516, 522 (M.D. Fla. 2021).

First, the Bankruptcy Court erred because it only analyzed one element – whether the Plan was proposed in good faith – when, based upon relevant case law, the Bankruptcy Court must independently confirm that all elements of 11 U.S.C. §1129 are present.

Second, Appellee did not meet its burden of proving each element of 11 U.S.C. §1129, let alone by a preponderance of the evidence.

## VI. <u>The Bankruptcy Court Erred in Confirming the Plan Because Appellee Did Not Meet its Burden of Overcoming Appellant's Objections to Confirmation</u>

When an objection to confirmation is filed, the burden does not shift to the objector to prove the objection. *In re Aspen Village at Lost Mountain Memory Care*, LLC, 609 B.R. 536 (N.D. Ga. 2019). Rather, the plan proponent, bears the burden of proving by a preponderance of the evidence that all statutory requirements under 11 U.S.C. § 1129(a) are satisfied. *Id.* The burden remains with the debtor throughout the confirmation process, regardless of the nature or scope of objections filed. *Id*.

Appellee solely argued the Plan could be confirmed over the objections of Appellants because the Plan was a non-consensual Plan and could be modified later. Appellee made no effort to address Appellants' arguments the Plan was not proposed in good faith. Appellants also argued that the Plan would not be feasible if the transactions were deemed true sales. Appellee failed to address that argument as

well. As such, Appellee did not meet its burden of overcoming Appellant's objections to confirmation.

## CONCLUSION

This Honorable Court must reverse the Bankruptcy Court because the Bankruptcy Court erred when it decided the issues outside an adversary proceeding without providing Appellant's notice or an opportunity to be heard on such issues and because all legal conclusions relied by the Bankruptcy Court in its Opinion were erroneous.

Respectfully Submitted,

*/s/ Shanna M. Kaminski*
Shanna M. Kaminski, Esq.
*Admitted Pro Hac Vice*
**KAMINSKI LAW, PLLC**
P.O. Box 247
Grass Lake, Michigan 49240
Telephone: (248) 462-7111
Email: skaminski@kaminskilawpllc.com

*-and-*

*/s/ Lauren G. Raines*
Lauren G. Raines, Esq.
Florida Bar No. 11896
**BRADLEY ARANT BOULT CUMMINGS, LLP**
1001 Water Street, Suite 1000
Tampa, FL 33602
Telephone: (813) 559-5500
Email: lraines@bradley.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7), excluding the sections set forth in Rule 8015(g), because it contains 14,247 words *as requested in Appellant's contemporaneously filed Motion to Exceed the Word Limit*. The brief also complies with the typeface requirements of Rule 8015(a)(5) because the brief is Times New Roman, 14-pt font.

*/s/ Lauren G. Raines*
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, I electronically filed the foregoing with the Clerk of Court using CM/ECF, which will send notification of such filing to counsel of record.

*/s/ Lauren G. Raines*____
*Counsel for Appellants*