Case No. 6:25-cv-02115-ACC

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

In re: IVF Orlando, Inc.
Bankruptcy Case No. 6:24-bk-05475-TPG

FOX FUNDING GROUP, LLC and OVERTON FUNDING, LLC,

Appellants,

v.

IVF ORLANDO, Inc.

Appellee.

On Appeal from the United States Bankruptcy Court for the
Middle District of Florida

# ANSWER BRIEF OF APPELLEE, IVF ORLANDO, INC.

**Daniel A. Velasquez, Esq.**
Florida Bar No. 0098158
dvelasquez@lathamluna.com
**Christina Y. Taylor, Esq.**
Florida Bar No. 0057616
ctaylor@lathamluna.com
**Latham, Luna, Eden & Beaudine, LLP**
201 S. Orange Avenue, Suite 1400
Orlando, FL 32801
Telephone: 407-481-5800
Facsimile: 407-481-5801

*Attorneys for Appellee, IVF Orlando, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Bankr. P. 8012, Appellee, IVF Orlando, Inc., makes the following corporate disclosure statement:

1. IVF Orlando, Inc. does not have a parent corporation.

2. No publicly held corporation owns 10% or more of IVF Orlando, Inc.'s stock.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ........ i

TABLE OF AUTHORITIES ........ iv

PRELIMINARY STATEMENT ........ 1

STATEMENT OF THE CASE ........ 1

Statement of Facts ........ 1

Procedural History ........ 2

Rulings Presented for Review ........ 5

SUMMARY OF ARGUMENT ........ 6

ARGUMENT ........ 8

I. THE CONFIRMATION ORDER SHOULD BE AFFIRMED BECAUSE THE PLAN COMPLIES WITH THE REQUIREMENTS OF 11 U.S.C. § 1129 AND 11 U.S.C. § 1191 ........ 8

A. The Bankruptcy Court Correctly Found that the Plan Satisfied All Elements of 11 U.S.C. § 1129 ........ 8

B. The Bankruptcy Court Did Not Abuse Its Discretion in Finding the Plan Was Proposed in Good Faith and Overruling the Objections 11

II. THE BANKRUPTCY COURT'S FINDING THAT THE FUNDERS DID NOT OWN DEBTOR'S POST-PETITION RECEIVABLES SHOULD BE AFFIRMED ........ 13

A. The Bankruptcy Court Correctly Found the Agreements Did Not Transfer Ownership of Debtor's Post-Petition Receivables ........ 13

B. The Bankruptcy Court Correctly Found that the Funders Did Not Have an Enforceable Security Interest in Debtor's Post-Petition Receivables ........ 21

C. The Bankruptcy Court Correctly Found that the MCAs Evidenced Loans, Not True Sales ........ 25

1. Under Florida law, courts consider the substance of a transaction rather than its form ....................25

2. The Funders rely on non-binding, non-precedential cases as well as inapplicable legal principles ....................34

III. THE CONFIRMATION ORDER SHOULD BE AFFIRMED BECAUSE THE FUNDERS WERE AFFORDED DUE PROCESS ....................37

CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ..........41

CERTIFICATE OF SERVICE ....................42

# TABLE OF AUTHORITIES

## Cases

*Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870 (9th Cir. 2008) ..........21

*Am. Acceptance Corp. v. Schoenthaler*, 391 F.2d 64 (5th Cir. 1968) ......................25

*Butler Trucking LLC v. CashFloit, LLC (In re Butler Trucking LLC)*, Case No.:32443, Adv. Pro. No. 25-03004, 2025 WL 1934205 (Bankr. N.D. Ohio July 14, 2025) .................................................................................................. 18, 28

*Cabuya Cherokee, SA v. Vogt*, 532 B.R. 383 (M.D. Fla. 2015) ...............................39

*Cap Call, LLC v. Foster* (*In re Shoot the Moon, LLC*), 635 B.R. 797 (Bankr. D. Mont. 2021) ....................................................................................................... 29, 30, 31

*Cap. Factors, Inc. v. Empire for Him, Inc. (In re Empire for Him, Inc.)*, 1 F.3d 1156 (11th Cir. 1993).......................................................................................................15

*Craton Ent., LLC v. Merch. Cap. Grp., LLC*, 314 So. 3d 627 (Fla. 3d DCA 2021)35

*Dep't of Legal Affs. v. Dist. Ct. of Appeal, 5th Dist.*, 434 So. 2d 310 (Fla. 1983)...35

*Diversified Enters., Inc. v. West*, 141 So. 2d 27 (Fla. 2d DCA 1962)......................36

*Express Working Capital, LLC v. Starving Students, Inc.*, 28 F. Supp. 3d 660 (N.D. Tex. 2014) ............................................................................................................20

*Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 20-cv-5120 (LJL), 2022 WL 1997207 (S.D.N.Y. June 6, 2022).......................................................................33

*Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885-cv, 2023 WL 3882697 (2d Cir. June 8, 2023) ..........................................................................30

*GMI Grp., Inc. v. Unique Funding Sols., LLC (In re GMI Grp., Inc.*), 606 B.R. 467 (Bankr. N.D. Ga. 2019) ........................................................................ 28, 29, 34

*Guan v. Ellingsworth Residential Cmty., Inc. (In re Ellingsworth Residential Cmty., Inc.)*, 125 F.4th 1365 (11th Cir. 2025) ..................................................................11

*In re Eddy*, 572 B.R. 774, (Bankr. M.D. Fla. 2017)..................................................39

*In re Hamilton*, 18 B.R. 868 (Bankr. D. Colo. 1982)......................................... 22, 23

*In re J.C. Householder Land Trust #1*, 501 B.R. 441 (Bankr. M.D. Fla. 2013)......11

*In re McKenzie Contracting, LLC*, No. 8:24-bk-01255-RCT, 2024 WL 3508375 (Bankr. M.D. Fla. July 19, 2024)........................................................ 27, 33, 34

*In re R&J Pizza Corp.*, Case No.: 14-43066-CEC, 2014 WL 12973408 (Bankr. E.D.N.Y. Oct. 14, 2014) ................................................................... 20, 21

*In re Watchmen Security LLC*, No. 24-000587-JMC-11, 2024 WL 4903363 (Bankr. S.D. Ind. Nov. 20, 2024)........................................................................ passim

*Jackson v. Le Centre on Fourth, LLC (In re Le Centre on Fourth, LLC*), 17 F.4th 1326 (11th Cir. 2021)...........................................................................39

*Kurtz v. Kalamata Cap. Grp., LLC (In re HMH Constr., LLC)*, Case No. 23-00191-NGH, Adv. No. 25-06027, 2026 WL 171515 (Bankr. D. Idaho Jan. 21, 2026)........................................................... 28, 29

*Lange v. Inova Cap. Funding, LLC (In re Qualia Clinical Serv., Inc.)*, 441 B.R. 325 (B.A.P. 8th Cir. 2011) ................................................................... 28, 29

*Lateral Recovery LLC v. Queen Funding, LLC*, 21 Civ. 9607 (LGS), 2022 WL 2829913 (S.D.N.Y. July 20, 2022) ....................................................30

*LPL Fin. LLC v. Bumstead (In re Bumstead*), 782 F. Supp. 3d 1026 (W.D. Wash. 2025)...............................................................................................23

*M Design Village, LLC v. Versant Funding LLC (In re M Design Village, LLC)*, Case No. 24-21406, 2025 WL 2088887 (Bankr. D.N.J. July 24, 2025) ......................19

*NetBank, FSB v. Kipperman (In re Com. Money Ctr., Inc.*), 350 B.R. 465 (BAP 9th Cir. 2006) ..........................................................................................29

*Oregrund Ltd. P'ship v. Shelve*, 873 So. 2d 451 (Fla. 5th DCA 2004) ....................26

*Qadan v. Fla. Prop. Grp. Assocs., Inc.*, 591 B.R. 796 (M.D. Fla. 2018) ................10

*Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678 (11th Cir. 2014) .................8, 9

*Singhal v. Unison Agreement Corp.*, CASE NO.: 2022-60656-CIV-SINGHAL, 2023 WL 2734230 (S.D. Fla. Mar. 31, 2023)...............................................................26

*U.S. Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) .................................. 39, 40

*US Connect, LLC v. Cap. Sols. Bancorp LLC*, No. 2:12-cv-615-FtM-29DNF, 2013 WL 4401840 (M.D. Fla. Aug. 14, 2013) ....................26

*Vachon v. Travelers Home & Marine Ins. Co.*, 403 So. 3d 451 (Fla. 2d DCA 2025) .................... 35, 36

*Williams Land Clearing, Grading, & Timber Logger, LLC v. Apex Funding Source LLC (In re Williams Land Clearing, Grading, & Timber Logger, LLC)*, Case No. 22-02094-5-PWM, Adversary Proceeding No. 23-00024-5-PWM, 2025 WL 1426503 (Bankr. E.D.N.C. May 16, 2025).................... 30, 31, 32

*Wood v. Fraser*, 677 So. 2d 15 (Fla. 2d DCA 1996) ....................36

**<u>Statutes</u>**

11 U.S.C. § 1129 ....................8, 9

11 U.S.C. § 1191 ....................9

11 U.S.C. § 541 ....................14

11 U.S.C. § 552 ....................23

Fla. Stat. § 559.9611 .................... 36, 37

Fla. Stat. § 559.9612 ....................37

Fla. Stat. § 559.9613 ....................36

Fla. Stat. § 679.2031 ....................21

Fla. Stat. § 687.03 ....................36

**<u>Other Authorities</u>**

John F. Hilsonal & Stephen L. Sepinuck, *A "Sale" of Future Receivables: Disguising a Secured Loan as a Purchase of Hope*, 9 Transactional Law. 14 (2019)15, 16, 17

Kara J. Bruce, *Revenue-Based Finance in Bankruptcy and Beyond*, 45 No. 4 Bankr. L. Letter NL 1 (Apr. 2025) ....................32

U.C.C. § 9-201 ....................24

U.C.C. § 9-203 .................... 21, 22

## PRELIMINARY STATEMENT

In this Brief, Appellants, Fox Funding Group, LLC ("Fox") and Overton Funding, LLC ("Overton"), are referred to collectively as the "Funders." Appellee, IVF Orlando, Inc., is referred to as "Debtor." The lower tribunal, the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, is referred to as the "Bankruptcy Court." References to documents included in the record on appeal filed with this Court are denoted by docket number as follows: "Doc #-## at p. #." References to the Funders' Initial Brief are denoted "Doc 15 at p. #." References to page numbers are to the page numbers identified in the top right corner of the ECF header.

## STATEMENT OF THE CASE

### Statement of Facts

Debtor is a was originally formed in 2009 by Dr. Milton McNichol ("Dr. McNichol"), the Debtor's sole shareholder and Medical Director. Doc 3-22 at p. 11. Dr. Nichols is a board-certified and licensed physician in the area of Obstetrics, Gynecology, Reproductive Endocrinology. *Id.* Debtor positions itself in the medical industry as a one-stop comprehensive diagnostic fertility testing facility with advanced reproductive services. *Id.* Debtor conducts its operations from a leased medical office space located in Longwood, Florida. *Id.*

For several years, Debtor experienced financial headwinds stemming from the

slow collection of receivables and increased financing costs. *Id.* To ensure available cash flow for business expenses, Debtor turned to a series of merchant cash advance type loans. *Id.* On September 16, 2024, Debtor and Overton entered into a Standard Merchant Cash Advance Agreement (the "Overton MCA"). Doc 4-1 at p. 11. On September 19, 2024, Debtor and Fox entered into a Future Receivables Sale and Purchase Agreement (the "Fox MCA"). Doc 4-16 at p. 13. The Overton MCA and the Fox MCA are referred to herein collectively as the "MCAs."

With overhead expenses and incoming revenue remaining relatively constant, Debtor found itself unable to maintain its existing debt structure without a restructuring of its balance sheet. Doc 3-22 at p. 11. On October 8, 2024, Debtor filed a voluntary petition for relief (the "Petition") under Subchapter V of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court (the "Bankruptcy Case"). Doc 3-8.

**<u>Procedural History</u>**

On October 14, 2024, Debtor filed an Emergency Motion for Authority to Use Cash Collateral (the "Cash Collateral Motion"). Doc 3-12. In the Cash Collateral Motion, Debtor acknowledged a senior secured security interest in Debtor's cash and cash equivalents held by FNB Community Bank ("FNB") by virtue of a UCC-1 Financing Statement filed with the State of Florida on September 9, 2022. Doc 3-12 at p. 2. On October 21, 2024, the Bankruptcy Court entered its First Interim Order

Granting Debtor's Motion to Use Collateral and Notice of Continued Hearing. Doc 3-14. The Bankruptcy Court subsequently entered additional interim orders approving Debtor's use of cash collateral on November 8, 2024 (Doc 3-18); January 2, 2025 (Doc 3-21); April 24, 2025 (Doc 3-40); and June 16, 2025 (Doc 3-53). The Funders did not object to Debtor's use of cash collateral. Doc 3-2 at 161.

On December 6, 2024, Overton filed its Proof of Claim No. 7-1 in the amount of $158,858.00 (the "Overton Claim"). Doc 4-11. The basis of the Overton Claim is referenced to be "Agreement for the sale of future receipts." *Id.* On December 6, 2024, Fox filed its Proof of Claim No. 8-1 in the amount of $89,223.35 (the "Fox Claim"). Doc 4-12. The basis of the Fox Claim is referenced to be "Agreement for the sale of future receivables." *Id.*

On January 6, 2025, Debtor filed its Subchapter V Plan of Reorganization for IVF Orlando, Inc. (Doc 3-22), which was modified pursuant to a First Modification to Plan of Reorganization for IVF Orlando, Inc. (collectively, the "Plan"). On February 12, 2025, the Funders each filed an Objection to Confirmation (collectively, the "Objections"). Doc 3-28; Doc 3-29. In the Objections, the Funders argued that the MCAs were sales of accounts/payment rights, which the Funders contended were not property of the Debtor's bankruptcy estate, and therefore Debtor did not propose the Plan in good faith because it sought to fund the Plan using the accounts alleged to have been sold. Doc 3-28 at p. 2; Doc 3-29 at p. 2.

On February 18, 2025, the Funders commenced adversary proceedings against Debtor asserting, among other counts, a request for a determination of whether the receivables contemplated by the MCAs are property of the Debtor's bankruptcy estate. Doc 4-1; Doc 4-6.

On March 24, 2025, Debtor filed its (1) Motion to Value Collateral and Determine Extent of Secured Claim of Fox Funding Group, LLC (Doc 3-34); and (2) Motion to Value Collateral and Determine Extent of Secured Claim of Overton Funding, LLC (Doc 3-35) (collectively, the "Motions to Value"). In the Motions to Value, Debtor contended that the value of its personal property was insufficient to secure any portion of the Funders' Claims due to a senior secured lien retained by FNB, which secures a loan in the amount of $522,947.51. Doc 3-34 at p. 3; Doc 3-35 at p. 3. On April 23, 2025, the Funders filed responses to the Motions to Value. Doc 3-38; Doc 3-39.

On June 3, 2025, the Bankruptcy Court entered Agreed Order Granting Debtor's Motion to Determine Extent of Secured Claim of Overton Funding, LLC (Doc 3-44), and on June 4, 2025, the Bankruptcy Court entered an Agreed Order Granting Debtor's Motion to Determine Extent of Secured Claim of Fox Funding Group, LLC (Doc 3-48) (collectively, the "Orders on Motions to Value"). In the Orders on Motions to Value, the Bankruptcy Court, pursuant to the agreement of Debtor and the Funders, ordered that to the extent the Funders retain Allowed Claims

(as defined in the Plan), such claims are wholly unsecured due to the recognized senior security interest identified in the Motions to Value. Doc 3-44 at p. 2; Doc 3-48 at p. 2.

On June 5, 2025, the Bankruptcy Court held a confirmation hearing to consider confirmation of the Plan, and on July 8, 2025, the Bankruptcy Court made on oral ruling in connection with the confirmation of the Plan and consideration of the Objections. Doc 3-3 at p. 1. On September 23, 2025, the Court entered its Order (1) Confirming Subchapter V Plan of Reorganization for IVF Orlando, Inc on a Non-Consensual Basis Pursuant to 11 U.S.C. § 1129(a), (b) and 1191(b); and (2) Setting Post-Confirmation Status Conference (the "Confirmation Order"). Doc 3-3. In the Confirmation Order, the Bankruptcy Court overruled the Objections and confirmed the Plan on a nonconsensual basis pursuant to 11 U.S.C. §§ 1129(a), (b) and 11 U.S.C. § 1191(b). Doc 3-3 at p. 3. On October 3, 2025, the Bankruptcy Court entered its Memorandum Opinion on Objections to Confirmation (the "Opinion"). Doc 3-2.

This appeal followed.

**<u>Rulings Presented for Review</u>**

In the instant appeal, the Funders challenge the Bankruptcy Court's entry of the September 23, 2025, Confirmation Order and the October 3, 2025, Opinion, which approved Debtors Plan of Reorganization.

## SUMMARY OF ARGUMENT

The Confirmation Order should be affirmed because the Bankruptcy Court correctly found that the Plan satisfied all of the requirements of 11 U.S.C. § 1129 and 11 U.S.C. § 1191. The Bankruptcy Court, considering the totality of the circumstances, found that the Plan and the circumstances surrounding the Plan were ordinary and did not reflect any bad faith. The Bankruptcy Court also found that the Plan had a reasonable hope of success after determining Debtor had the ability to fund the Plan with the income derived from its post-petition services. The Funders fail to identify any error in the Bankruptcy Court's findings, much less clear error, and the Funders have waived their arguments by putting forth only conclusory, unsupported arguments in their Initial Brief.

The Bankruptcy Court did not err in finding that the Funders neither owned nor had a security interest in Debtor's post-petition receivables. With respect to ownership, the Bankruptcy Court determined the MCAs could not transfer ownership of Debtor's post-petition receivables because, at the time the MCAs were executed, Debtor had only a hope of future receivables, which cannot be the subject of a present transfer of property. The Bankruptcy Court's reasoning is supported by factually analogous decisions from other bankruptcy courts. Contrary to the Funders' interpretation of the Opinion, the Bankruptcy Court did not hold a party cannot agree to *sell* future receivables, only that there can be no *transfer* of those

receivables until they come into existence. Because receivables that come into existence post-petition are part of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541, the Bankruptcy Court correctly determined that the Funders did not own Debtor's post-petition receivables.

The Bankruptcy Court likewise did not err in finding the Funders did not have an enforceable security interest in Debtor's post-petition receivables because, pursuant to 11 U.S.C. § 552(a), a pre-petition security interest generally does not attach to post-petition property, and thus even if the MCAs purported to grant security interests in Debtor's future receivables, such interests would not be enforceable as to receivables received by Debtor for post-petition services.

The Bankruptcy Court also did not err in finding the MCAs reflected loan transactions and not sales. Under Florida law, courts look to the substance of a transaction, rather than the labels used by the parties, to determine whether the transaction should be characterized as a loan. In its analysis, the Bankruptcy Court considered factors commonly used by courts to determine the true nature of a transaction and correctly found that Debtor, not the Funders, retained the risk of nonpayment. Among other things, under the MCAs, the Funders had the ability to seek recourse against personal guarantees by the Debtor's principal and by virtue of blanket liens on all of Debtor's accounts.

Finally, the Confirmation Order should be affirmed because the Funders were

afforded due process. Due process is satisfied where a party is given actual notice and an opportunity to be heard, even if there is a violation of a procedural right under the Federal Rules of Bankruptcy Procedure. Not only did the Funders have notice of the issues raised in the Confirmation Order through numerous filings in the Bankruptcy Case but the Funders affirmatively raised the issues in the Objections, which the Bankruptcy Court adjudicated as part of the confirmation process.

## ARGUMENT

### I. THE CONFIRMATION ORDER SHOULD BE AFFIRMED BECAUSE THE PLAN COMPLIES WITH THE REQUIREMENTS OF 11 U.S.C. § 1129 AND 11 U.S.C. § 1191.

#### A. The Bankruptcy Court Correctly Found that the Plan Satisfied All Elements of 11 U.S.C. § 1129.

The Funders contend the Bankruptcy Court erred by confirming the Plan, arguing, in mere conclusory fashion, that (1) the Bankruptcy Court analyzed only whether the Plan was proposed in good faith; and (2) Debtor did not meet its burden of proving each element of 11 U.S.C. § 1129. Doc 15 at 64. The Funders fail to identify what provisions of 11 U.S.C. § 1129 they contend have not been proven and fail to identify anything in the record to support their argument. To properly raise an issue on appeal, an appellant must not only prominently state the issue but also must include in its brief actual argument on the issue. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). The Eleventh Circuit has "long held that an appellant abandons a claim when he either makes only passing

references to it or raises it in a perfunctory manner without supporting arguments and authority." *Id.* The Funders failed to include actual argument on their purported issues regarding plan compliance and therefore waived those issues.

Even if the Funders adequately briefed their arguments regarding plan compliance, the Funders' arguments nevertheless lack merit because the Plan satisfies all statutory requirements. In a Subchapter V case, if the applicable requirements of 11 U.S.C. § 1129(a) are met, other than paragraphs (8), (10), and (15), then "the court, on request of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1191(b). The Plan meets all of the necessary of requirements of 11 U.S.C. § 1129(a). Among other things, the Plan sets forth the treatment of each impaired class of claims or interests; the means of implementation of the Plan; and the post-confirmation management, control, and operation of Debtor. Doc 3-22.

In the Confirmation Order, the Bankruptcy Court expressly found that the Plan satisfied the requirements of 11 U.S.C. § 1129(a) and (b) and 11 U.S.C. § 1191(b). Doc 3-3 at pp. 2-3. In an appeal from an order entered by a bankruptcy court, a district court reviews the bankruptcy court's factual findings for clear error. *See, e.g.*, *Qadan v. Fla. Prop. Grp. Assocs., Inc.*, 591 B.R. 796, 807 (M.D. Fla. 2018). "A

factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* The party seeking to overturn the findings of a bankruptcy court has the burden to show the findings constitute clear error. *Id.* at 808.

The Funders fail to identify any evidence or lack thereof that could form the basis of a definite and firm conviction that the Bankruptcy Court committed a mistake. As stated in the Confirmation Order, the Bankruptcy Court made its findings based upon its review and consideration of the Plan, the exhibits filed by Debtor, the proffered testimony, and the presentation and arguments of counsel present at the confirmation hearing. Doc 3-3 at p. 2. The filed exhibits included the following: (1) Subchapter V Plan of Reorganization; (2) First Modification to Subchapter V Plan of Reorganization; (3) Feasibility Analysis; (4) Liquidation Analysis; (5) Ballot Tabulation; and (6) Confirmation Affidavit. Doc 3-3 at p. 2; Doc 3-50. The Funders' conclusory arguments fail to demonstrate the Bankruptcy Court committed any error—much less clear error—in confirming the Plan, and thus the Confirmation Order should be affirmed. *See Guan v. Ellingsworth Residential Cmty., Inc. (In re Ellingsworth Residential Cmty., Inc.)*, 125 F.4th 1365, 1380 (11th Cir. 2025) (affirming order confirming plan where appellant "pointed to nothing to support that the Bankruptcy Court's conclusions are clearly erroneous").

### B. **The Bankruptcy Court Did Not Abuse Its Discretion in Finding the Plan Was Proposed in Good Faith and Overruling the Objections.**

The Funders also argue the Bankruptcy Court erred in confirming the Plan because Debtor allegedly did not meet its burden of overcoming the Objections. According to the Funders, Debtor "made no effort to address Appellants' arguments the Plan was not proposed in good faith" or "that the Plan would not be feasible if the transactions were deemed true sales." Doc 15 at p. 64. The Funders offer no elaboration (or legal authority) to demonstrate reversible error by the Bankruptcy Court, nor could they because the Bankruptcy Court addressed both good faith and feasibility in the Opinion. Doc 3-2 at pp. 10-13.

The Bankruptcy Code does not define the term "good faith," and bankruptcy courts therefore "determine the existence of good faith in light of the totality of the circumstances." *In re J.C. Householder Land Trust #1*, 501 B.R. 441, 451 (Bankr. M.D. Fla. 2013). When considering the totality of circumstances, "courts generally focus on the terms of the plan and the ability of the plan to achieve the objectives of the Bankruptcy Code." *Id.* at 451. In the Opinion, after detailing the procedural history of the case and the confirmation proceedings, the Bankruptcy Court found that nothing about the "circumstances leading up to confirmation is unusual, beyond perhaps the length of time the Funders waited before asserting their claims to own the Debtor's future receivables." Doc 3-2 at p. 11; *see also id.* at pp. 27-28 (finding "[t]he Plan and the totality of the circumstances surrounding it are ordinary and do

not reflect bad faith, and the Plan has a reasonable hope of success").

In the Opinion, the Bankruptcy Court found that "Debtor's exhibits admitted during the confirmation hearing (Doc No. 132) were adequate to demonstrate that if the Plan's proposed treatment of the Funder's claims, to the extent allowed, as Class 8 unsecured claims is merited, then the Plan has a reasonable hope of success." Doc 3-2 at p. 12. With respect to feasibility, the Bankruptcy Court expressly addressed the issue of the Funders' alleged interest in Debtor's post-petition receivables, stating as follows:

> If the Debtor does not own its future receivables, the Debtor cannot reorganize using the income it derives from its post-petition services. The issue is outcome determinative on whether the Plan has a reasonable hope of success. As such, the decision cannot be postponed until the adversary proceedings, which assert other counts, are resolved. Therefore, the Court will determine the nature of the Funders' interests in the context of the Funders' objections to confirmation.

Doc. 3-2 at p 12.

As detailed in Section II, *infra*, the Bankruptcy Court ultimately (and correctly) found that the Funders did not own or have a security interest in Debtor's post-petition receivables. Accordingly, Debtor is able to reorganize using the income generated by its post-petition services, and the Bankruptcy Court correctly found that the Plan has a reasonable hope of success. Because the Plan meets all of the applicable requirements of 11 U.S.C. § 1129(a), (b) and 11 U.S.C. § 1191(b), the Confirmation Order therefore should be affirmed.

## II. THE BANKRUPTCY COURT'S FINDING THAT THE FUNDERS DID NOT OWN DEBTOR'S POST-PETITION RECEIVABLES SHOULD BE AFFIRMED.

### A. The Bankruptcy Court Correctly Found the Agreements Did Not Transfer Ownership of Debtor's Post-Petition Receivables.

The Funders objected to confirmation of the Plan based on their argument that (1) the MCAs effectuated a sale of Debtor's "accounts/rights to payment"; (2) pursuant to U.C.C. § 9-318(a), Debtor did not have any interest in the property after the sale; and thus (3) Debtor sought to fund the Plan with property in which it had no interest. Doc 3-28 at p. 2; Doc 3-29 at p. 2. The Bankruptcy Court overruled the Objections, finding the MCAs did not effectuate a present transfer of Debtor's future receivables because, at the time the MCAs were executed, "Debtor had no future receivables to convey, only a hope they may come to exist." Doc 3-2 at p. 13.

The Bankruptcy Court rooted its finding in the fundamental legal principle *nemo dat quod non habet*–that is, "one cannot sell more than one owns." Doc 3-2 at p. 15. As the Bankruptcy Court explained, "Debtor had only an expectancy of future receivables, which cannot be the subject of a sale. The Debtor did not have any property rights to convey when entering the MCAs as its interests in future receivables had not vested." Doc 3-2 at pp. 14-15. The Bankruptcy Court did not err in finding that the Funders did not own Debtor's post-petition accounts receivable and therefore the Confirmation Order should be affirmed.

In the Initial Brief, the Funders argue that "[t]he Bankruptcy Court's

conclusion that future accounts receivable cannot be sold ignores the very definition of the term account receivable under applicable law." Doc 15 at p. 29. Not so. The Bankruptcy Court explained that "U.C.C. § 9-318(a) references accounts, chattel paper, payment intangibles, and promissory notes, each a type of property the U.C.C. contemplates to exist in the present for the purpose of conveyance." Doc 3-2 at p. 15. The Bankruptcy Court further explained that

> U.C.C. § 9-102(a)(12) defines "collateral" to mean "the *property* subject to a security interest … [including] (A) proceeds to which a security interest attaches; (B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold …" (emphasis added). A hope of future receivables is not property within the meaning of U.C.C. § 9-318(a) or U.C.C. § 9-102(a)(12).

Doc 3-2 at p. 15 (alterations in original).

The Bankruptcy Court also cited 11 U.S.C. § 541(a)(7) as grounds for rejecting the Funders' argument that at the time of execution the MCAs transferred present ownership of future receivables. Pursuant to 11 U.S.C. § 541, the commencement of a bankruptcy case creates an estate comprised of, *inter alia*, "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). As the Bankruptcy Court stated, the statute "plainly encompasses the receivables earned by Debtor for post-petition services, which the prepetition Debtor lacked the authority to convey." Doc 3-2 at p. 16. The Bankruptcy Court thus properly concluded "U.C.C. § 9-318(a) does not divest the

Debtor of any legal or equitable rights in the post-petition receivables." Doc 3-2 at p. 16. *See Cap. Factors, Inc. v. Empire for Him, Inc. (In re Empire for Him, Inc.)*, 1 F.3d 1156, 1159 (11th Cir. 1993) ("Section 541(a)(1) defines property of the estate to include 'all legal or equitable interest of the debtor in property as of the commencement of the case.' … This language plainly includes the funds held by Capital Factors, even though those funds were subject to Capital Factors' security interest.").

Indeed, the Bankruptcy Court's Opinion addresses the distinction between a present *transfer* of future property and a promise to *sell* future property. The Bankruptcy Court stated "[t]he law does not comprehend or countenance a present transfer of future property. … Rather, the law treats such as a promise or an agreement to sell, not a present sale." Doc 3-2 at pp. 13-14 (citing John F. Hilsonal & Stephen L. Sepinuck, *A "Sale" of Future Receivables: Disguising a Secured Loan as a Purchase of Hope*, 9 Transactional Law. 14, 15 (2019) (hereinafter, "*A 'Sale' of Future Reciveables*")). The Bankruptcy Court's conclusion is not, as the Funders contend, that a party cannot make an *agreement* to sell future (non-existent) accounts receivable; rather, the Bankruptcy Court held that an agreement to sell future accounts receivable does not constitute a present transfer or conveyance of property.

The Funders' contention that the Bankruptcy Court did not cite authority to support its conclusion (Doc 15 at p. 30) is plainly untrue. In support of its

determination that Debtor lacked the ability to transfer future receivables that do not come into existence until after the petition date, the Bankruptcy Court cited *In re Watchmen Security LLC*, No. 24-000587-JMC-11, 2024 WL 4903363 (Bankr. S.D. Ind. Nov. 20, 2024), which the Bankruptcy Court found "to be the most persuasive, thorough, and factually similar." Doc 3-2 at p. 15. In *In re Watchmen Security LLC*, a creditor asserted a secured claim in "Accounts/Purchased Receipts" based on a Standard Merchant Cash Advance Agreement with the debtor. 2024 WL 4903363, at *1. Like the Funders, the creditor argued that, pursuant to the agreement, it owned the debtor's post-petition accounts receivable and that its interest was not limited by 11 U.S.C. § 552(a) because the interest was purchased pre-petition. *Id.* at *2.

The bankruptcy court disagreed, stating "[i]t cannot be posited that a pre-petition debtor somehow has the authority and power to sell or otherwise transfer any interest in accounts receivable which do not come into existence until post-petition and are, therefore, property of the bankruptcy estate." *Id.* at *4. The bankruptcy court explained it was legally impossible to transfer such an interest, stating "[t]he law simply does not comprehend or countenance a present transfer of future property." *Id.* (quoting *A "Sale" of Future Receivables* at 15). The bankruptcy court further stated that while a *promise* to transfer property that may be acquired in the future may be enforceable as an executory agreement to sell, "it is a basic legal maxim that 'one cannot give what one does not have' (or, in one of several

phrasings in Latin, '*nemo dat qui non habet*')." *Id.* (quoting *A "Sale" of Future Receivables* at 15).

Turning to the issue of the creditor's claimed interest in the debtor's post-petition accounts receivable, the bankruptcy court determined the "Debtor did not and could not effect a post-petition transfer of any interest in post-petition receivables by sale or grant of a security interest," as it would constitute an unauthorized transfer of property of the bankruptcy estate. *Id.* at *5 & n.9. The bankruptcy court likewise determined the post-petition receivables were not "proceeds" under Article 9 of the U.C.C. because the debtor was a service company and thus the "Debtor's post-petition receivables arose from services performed by Debtor post-petition and, therefore, could not have been identifiable proceeds of pre-petition collateral." *Id.* at *5.

In the Opinion, the Bankruptcy Court specifically agreed with the reasoning in *In re Watchmen Security LLC* and concluded

> a mere expectancy of future receivables dependent upon future services cannot be the subject of a completed sale transaction. Under the MCAs here, the Debtor lacked a vested property right to transfer on the MCA's execution date. The most the Debtor could do is promise to transfer any such receivables in the future.

Doc 3-2 at 16 (internal footnote omitted).

Indeed, *In re Watchmen Security LLC* is not the only case to recognize the principle of "*nemo dat*" in connection with the determination of whether post-

petition receivables are property of the bankruptcy estate. For example, in *Butler Trucking LLC v. CashFloit, LLC (In re Butler Trucking LLC)*, Case No.:32443, Adv. Pro. No. 25-03004, 2025 WL 1934205 (Bankr. N.D. Ohio July 14, 2025), the bankruptcy court first recognized "[t]he general rule of law is undoubted that no one can transfer a better title than he himself possesses. *Nemo dat quod non habet.*" *Id.* at *8 (citing cases). The bankruptcy court then explained that, under the principle of *nemo dat*, the sale of a debtor's receivables is not completed until the receivables actually come into being:

> While this "*Nemo dat*" maxim could arguably have application to wholly rejecting the purported "sale" of receipts not yet in existence, this court cites it for a narrower point: if there was a sale transaction, it was not completed until the future receipts came into existence. Thus, the Plaintiff-Debtor would have to create the receivables that – if this was truly a sales transaction – would then become Defendant's property, with possession acquired by the debiting of the "Account" per the MCA Agreement.

*Id.* at *8-9.

Similarly, In *M Design Village, LLC v. Versant Funding LLC (In re M Design Village, LLC)*, Case No. 24-21406, 2025 WL 2088887 (Bankr. D.N.J. July 24, 2025), the debtor entered into pre-petition Sale of Future Receipt Agreements with two creditors. *Id.* at *1. The creditors contended the agreements constituted "true sales" and therefore the future receipts purchased pursuant to the agreements were not property of the debtor's bankruptcy estate. *Id.* at *2. The bankruptcy court

disagreed, stating the creditors "are essentially asking this Court to rule that the Debtor, prior to the Petition Date, had the ability to sell or transfer an interest in accounts receivable that may or may not come into existence until after the Petition Date. The Court finds this argument unconvincing." *Id.* at *6. The bankruptcy court, quoting *In re Watchmen Security LLC*, stated "a putative present sale of rights to payment that do not yet exist … is both a metaphysical and legal impossibility. … A transfer of rights to payment—that is, rights that as yet do not exist—cannot occur unless and until the rights to payment arise." *Id.* (citing *In re Watchmen Sec. LLC*, 2024 WL 4903363, at *4) (ellipses in original).

In the Initial Brief, the Funders make no attempt to distinguish *In re Watchmen Security LLC*. Instead, the Funders make the facile argument that "federal courts that have been faced with the question of whether future accounts receivable can be sold have answered in the affirmative." Doc 15 at p. 30. The Funders' argument misses the mark and conflates the issues of when an agreement constitutes a sale and what constitutes property of the bankruptcy estate. The cases cited by the Funders do not hold that an agreement to sell future accounts receivable automatically excludes a debtor's post-petition receivables from the bankruptcy estate.

The Funders quote extensively from *Express Working Capital, LLC v. Starving Students, Inc.*, 28 F. Supp. 3d 660 (N.D. Tex. 2014), a non-bankruptcy case that does not address the critical issue of what constitutes property of the bankruptcy

estate. In that case, the parties, who the court found to be "experienced," had a years-long business relationship pursuant to which "the parties engaged in arm's length transactions whereby Defendants sold a percentage of their future credit card receivables for a cash advance." *Id.* at 669. In determining the parties intended for their agreements to be sales, the court considered, among other things, the fact that the agreements did not have scheduled payments; rather, the creditor was paid only if the customers made purchases using credit, charge, debit, or prepaid cards. *Id.* at 671. In addition to being factually distinguishable, *Express Working Capital, LLC* has no bearing on the central issue here: whether the Funders own Debtor's post-petition receivables or whether such receivables are property of the bankruptcy estate.

The Funders' reliance on *In re R&J Pizza Corp.*, Case No.: 14-43066-CEC, 2014 WL 12973408 (Bankr. E.D.N.Y. Oct. 14, 2014) also is misplaced. There, the court determined the subject agreement was a true sale based on terms absent from the MCAs at issue here, including, importantly, that the debtor did not retain any rights to service or collect the proceeds of the purchased accounts, and the debtor was prohibited from commingling its credit card receivables with the credit card receivables purchased pursuant to the agreement. *Id.* at *5.

Unlike the debtor in *In re R&J Pizza Corp.*, which did not retain any rights in, and had no control over, the purchased receivables, here, Debtor continued to have

the right to service and collect the allegedly purchased receivables. As such, Debtor retained an interest in the receivables that became property of the bankruptcy estate. *See Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870, 877 (9th Cir. 2008) (affirming bankruptcy court's determination that transfer of debtor's post-petition accounts receivable involved property of the estate, noting that creditor "fail[ed] to recognize the difference between the accounts receivable themselves and the funds paid by the account debtors" and that debtor "had a legal interest in its accounts receivable in the form of a right to collect them").

**B. The Bankruptcy Court Correctly Found that the Funders Did Not Have an Enforceable Security Interest in Debtor's Post-Petition Receivables.**

In addition to correctly finding that the Funders did not own Debtor's post-petition receivables, the Bankruptcy Court also correctly held that the Funders did not have a security interest in Debtor's post-petition receivables. Doc 3-2 at pp. 16-17. Pursuant to U.C.C. § 9-203(b)(2),[1] a security interest is enforceable with respect to collateral only if "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party." As explained by the Bankruptcy Court, the Funders did not have an enforceable security interest in Debtor's post-petition receivables because the definition of "collateral" in U.C.C. § 9-203(b)(2) "presupposes the existence of property and rights in that property. But here, the

[1] Florida has adopted these provisions in Fla. Stat. § 679.2031.

Debtor had no vested rights and no power to transfer its post-petition receivables when it entered the MCAs prepetition." Doc 3-2 at p. 17. *See In re Hamilton*, 18 B.R. 868, 870 (Bankr. D. Colo. 1982) ("It is impossible on the face to have a vested property right in after-acquired property. This is so because, by definition, after-acquired property is a mere contingency.").

The Funders' argue that the Bankruptcy Court erred because security interests in after-acquired property are enforceable. Doc 15 at pp. 33-34. What the Funders fail to appreciate, however, is the difference between *granting* a security interest in after-acquired property and the time at which a security interest *attaches* to such after-acquired property. Pursuant to U.C.C. § 9-203(a), "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral." Indeed, the comments to U.C.C. § 9-203 confirm that "in accordance with basic personal property conveyancing principles, the baseline rule is that *a security interest attaches only to whatever rights a debtor may have*, broad or limited as those rights may be." *Id.* at cmt. 6 (emphasis added). Thus, even assuming the MCAs granted the Funders a security interest in Debtor's future receivables, there was nothing to which the security interest could attach until the receivables actually came into existence. *See In re Hamilton*, 18 B.R. at 870 ("Since after-acquired property is not in existence at the time of the agreement the most which the Bank could have acquired by their agreement with the Debtor was a vested interest, which,

had the property ever come into existence, would have become a vested property right.”).

Whether an agreement grants a security interest in after-acquired property does not resolve the issue of whether the security interest is enforceable once the debtor files bankruptcy. As stated in *LPL Financial LLC v. Bumstead (In re Bumstead*), 782 F. Supp. 3d 1026 (W.D. Wash. 2025), which the Funders cite in the Initial Brief, “[t]he Bankruptcy Code provides that generally, a bankruptcy filing cuts off security interests in property acquired by a debtor’s estate after ‘the commencement of the case.’” *Id.* at 1028 (citing 11 U.S.C. § 552(a)); *see also In re Watchmen Security LLC*, 2024 WL 4903363, at *7 (stating that, even if agreement granted interest in debtor’s receivables, “any claim that such a security interest would attach to Debtor’s post-petition receivables would be defeated by 11 U.S.C. § 552(a)”). Specifically, 11 U.S.C. § 552(a) provides that “property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.” Thus, even assuming the MCAs granted the Funders security interests in Debtor’s future receivables, those security interests are not enforceable against Debtor’s post-petition receivables.

Moreover, while 11 U.S.C. § 552(b) provides an exception where a security agreement extends to proceeds of property acquired by a debtor prior to

commencement of the bankruptcy case, the exception does not apply here because Debtor's post-petition receivables are not proceeds of Debtor's pre-petition receivables. As the Bankruptcy Court explained, because "Debtor performs in vitro fertilization services," there is no connection between Debtor's pre-petition and post-petition receivables. Doc 3-2 at p. 18. *See In re Watchmen Security LLC*, 2024 WL 4903363, at *5 ("Any of Debtor's post-petition receivables arose from services performed by Debtor post-petition and, therefore, could not have been identifiable proceeds of pre-petition collateral.").

In the Initial Brief, the Funders argue their security interests are "not even subject to 11 U.S.C. § 552(a)" because the interests "arose automatically" and not "via a security agreement." Doc 15 at p. 36. According to the Funders, section 552(a) "governs only security interests that were created by a security agreement." *Id.* The Funders do not cite any authority that supports their interpretation of Section 552(a), and their argument appears to be an amalgamation of different concepts regarding security interests. In any event, the Funders' argument is based on their faulty premise that their alleged security interests did not arise out of a security agreement. The Uniform Commercial Code defines "security agreement" broadly as "an agreement that creates or provides for a security interest." U.C.C. § 9-201(74). To the extent the Funders have security interests in Debtor's future receivables, those interests were created or provided for by the MCAs and, as such,

the MCAs would fall within the U.C.C.'s definition of "security agreement."

### C. <u>The Bankruptcy Court Correctly Found that the MCAs Evidenced Loans, Not True Sales</u>.

#### 1. Under Florida law, courts consider the substance of a transaction rather than its form.

The Funders incorrectly assert that the Bankruptcy Court "largely ignored Florida law" in analyzing whether the transactions evidenced by the MCAs constituted sales or loans. *See* Doc 15 at p. 38. The Funders fail to identify what provisions of Florida law the Bankruptcy Court allegedly ignored or how a different result would obtain thereunder. The cases cited by the Bankruptcy Court are entirely consistent with Florida law and, indeed, the Funders offer no explanation to suggest otherwise.

Florida law is well-settled that when determining whether a transaction constitutes a loan versus a sale, courts look to the substance of the transaction over its form. *See, e.g.*, *Am. Acceptance Corp. v. Schoenthaler*, 391 F.2d 64, 69 (5th Cir. 1968) ("Time and again the Florida courts have looked to the substance of a transaction to determine if it was a loan rather than a purported sale."); *US Connect, LLC v. Cap. Sols. Bancorp LLC*, No. 2:12-cv-615-FtM-29DNF, 2013 WL 4401840, at *2 (M.D. Fla. Aug. 14, 2013) ("The substance of a transaction, rather than the form, will determine whether a transaction is usurious."); *Singhal v. Unison Agreement Corp.*, CASE NO.: 2022-60656-CIV-SINGHAL, 2023 WL 2734230, at

*5 (S.D. Fla. Mar. 31, 2023) ("The law is clear that the substance of a transaction rather than the form is examined to determine whether the transaction should be considered a loan."); *Oregrund Ltd. P'ship v. Shelve*, 873 So. 2d 451, 457 (Fla. 5th DCA 2004) ("Courts look to the *substance* of the transaction to determine whether a transaction is usurious."). As such, merely because an agreement is labeled as a sale does not make it so.

The Bankruptcy Court's detailed analysis of the MCAs plainly focused on the substance of the underlying transactions, and the Bankruptcy Court did not err in finding that, based on the substance of the transactions, the MCAs evidenced loans, not true sales. In analyzing whether the MCAs evidenced a loan agreement versus a sale transaction, the Bankruptcy Court explained that "[w]hen considering the 'sale versus' loan issue, courts place the most emphasis on the transfer of risk—if the 'buyer' is absolutely entitled to repayment under all circumstances, then the risk remains with the 'seller' and the transaction is considered a loan." Doc 3-2 at pp. 18-19 (citing *In re McKenzie Contracting, LLC*, No. 8:24-bk-01255-RCT, 2024 WL 3508375, at *2 (Bankr. M.D. Fla. July 19, 2024)).

The Bankruptcy Court identified three primary factors that guide the determination of whether a transaction is considered a sale or a loan: "(i) a finite term, (ii) a reconciliation provision, and (iii) recourse provisions in the event of a bankruptcy or default." Doc. 3-2 at p. 19 (citing *In re McKenzie Contracting, LLC*,

2024 WL 3508375, at *2). The Bankruptcy Court noted, however, that the three "factors are only a guide and do not dictate the conclusion." *Id.* (citing *In re McKenzie Contracting, LLC*, 2024 WL 3508375, at *2)

After reviewing the MCAs in detail, the Bankruptcy Court found that both agreements were properly characterized as loan transactions. The Bankruptcy Court found that "the Overton Agreement easily qualifies as a loan transaction when evaluating the transfer of risk, and this factor carries the greatest weight." Doc 3-2 at p. 22. The Bankruptcy Court summarized that "Overton's recourse to Dr. McNichol and the Debtor's other accounts reflect that Overton did not fully assume the risk of nonpayment." *Id.* at 22-23. The Bankruptcy Court found that "the Fox Agreement does not contain a term, likely does not afford the Debtor an opportunity to request a reconciliation, and does not transfer the risk from the Debtor to Fox." *Id.* at 26. The Bankruptcy Court concluded that "[a]ffording the most weight to the agreement's failure to transfer the risk to Fox as evidenced by Fox's recourse to Dr. McNichol, the Court determines the Fox Agreement reflects a loan transaction rather than a sale." *Id.*

Like the Bankruptcy Court, numerous bankruptcy courts and district courts have analyzed the substance of purported sale agreements to determine whether they actually constituted disguised loans. *See GMI Grp., Inc. v. Unique Funding Sols., LLC (In re GMI Grp., Inc.)*, 606 B.R. 467, 485 (Bankr. N.D. Ga. 2019) (stating court

must "examine the actual substance rather than the form of the Agreement to determine its true nature"); *In re Butler Trucking LLC*, 2025 WL 1934205, at *5 (stating that, in determining whether a transaction is a loan, "courts do not rely solely on the form or labels used by the parties; rather, they scrutinize whether the economic risk of ownership truly transferred to the purported buyer" (internal footnote omitted)); *Kurtz v. Kalamata Cap. Grp., LLC (In re HMH Constr., LLC)*, Case No. 23-00191-NGH, Adv. No. 25-06027, 2026 WL 171515, at *3 (Bankr. D. Idaho Jan. 21, 2026) ("When determining whether a transaction is a usurious loan it must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it."); *Lange v. Inova Cap. Funding, LLC (In re Qualia Clinical Serv., Inc.)*, 441 B.R. 325, 329-30 (B.A.P. 8th Cir. 2011) ("The question for the court then is whether the [n]ature of the recourse, and the true nature of the transaction, are such that the legal rights and economic consequences of the agreement bear a greater similarity to a financing transaction or to a sale.").

Similarly, like the Bankruptcy Court, courts frequently give the greatest weight to the transfer of risk when characterizing a transaction as a loan versus a sale. *Cap Call, LLC v. Foster* (*In re Shoot the Moon, LLC*), 635 B.R. 797, 813 (Bankr. D. Mont. 2021) (stating "a consideration that overlays and unites the factors is how the parties allocated ***risk***"); *In re HMH Constr., LLC*, 2026 WL 171515, at *3

(stating "key consideration is the transfer of risk"); *In re GMI Grp., Inc.*, 606 B.R. at 485 (finding "the Agreement provides for guaranteed repayment; accordingly, the existence of the three factors does not end the inquiry into the true substance of the Agreement"); *In re Qualia Clinical Serv., Inc.*, 441 B.R. at 330 ("This agreement, which shifts all risk to [the debtor], is a disguised loan rather than a true sale. Where the 'seller' retains 'virtually all of the risk of noncollection,' the transaction cannot properly be considered a true sale."); *NetBank, FSB v. Kipperman (In re Com. Money Ctr., Inc.)*, 350 B.R. 465, 484 (BAP 9th Cir. 2006) ("The absence of risk 'seems to result in a finding of a debtor-creditor relationship in most cases.'"). As one court explained,

> when determining whether a transaction was a true sale of receivables or a loan, "[t]he root of [the analysis] is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor."

*Lateral Recovery LLC v. Queen Funding, LLC*, 21 Civ. 9607 (LGS), 2022 WL 2829913, at *4 (S.D.N.Y. July 20, 2022) (brackets in original).

As the Bankruptcy Court found, the MCAs contain numerous terms that courts have found to be indicative of a loan notwithstanding language in the agreements purporting to characterize the transactions as sales. The Bankruptcy Court found that, despite being drafted to convey that the Funders bore the risk of

nonpayment, in actuality the MCAs contained provisions that provide recourse to the Funders. For example, Debtor's principal unconditionally guaranteed performance of all of Debtor's obligations under the MCAs, which necessarily includes performance of Debtor's payment obligations. Doc 3-2 at pp. 22, 27. The Funders' ability to seek recourse against the guarantors demonstrates the Funders did not bear the risk of nonpayment. *See Williams Land Clearing, Grading, & Timber Logger, LLC v. Apex Funding Source LLC (In re Williams Land Clearing, Grading, & Timber Logger, LLC)*, Case No. 22-02094-5-PWM, Adversary Proceeding No. 23-00024-5-PWM, 2025 WL 1426503, at *8 (Bankr. E.D.N.C. May 16, 2025) (personal guaranty of debtor's principal was indicia that risk of loss remained with debtor); *In re Shoot the Moon, LLC*, 635 B.R. at 816 n.54 (stating "the personal guaranty of 'performance' of an 'obligation' to pay money to [creditor] is functionally a payment guaranty"); *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885-cv, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023) (personal guaranty of merchant agreement was evidence of loan).

Additionally, the MCAs granted the Funders security interests in *all* of Debtor's accounts and proceeds, not just the allegedly purchased accounts receivable. Doc 3-2 at pp. 22-24. The Funders' ability to seek recourse against all of Debtor's accounts receivable is further evidence that the Funders did not bear the risk of non-payment. *See In re Williams Land Clearing, Grading, & Timber Logger,*

*LLC*, 2025 WL 1426503, at *7 (stating blanket lien on assets was "evidence of recourse in the event of bankruptcy"); *In re Shoot the Moon, LLC*, 635 B.R. at 814-15 (security interest in all payment and general intangibles was indicative of a loan, not a sale).

Further, under the MCAs, a change in Debtor's bank account would trigger an event of default. Doc 4-6 at p. 21; Doc 4-1 at p. 17. However, as the Bankruptcy Court noted, "Region 21 of the U.S. Trustee Program, which includes Florida, requires a Chapter 11 debtor to 'close its prepetition bank accounts and open new debtor-in-possession accounts and provide documentation of these actions to the United States Trustee." Doc 3-2 at p. 21 n.30. Thus, even though bankruptcy is not a specified event of default, "that does not end the inquiry, because a number of other defaults occur by necessity when a bankruptcy is filed (for example, changing the depository account into which receivables are paid by the opening of a DIP account), which, by the terms of the MCA Agreement, do result in acceleration of all amounts due." *See In re Williams Land Clearing, Grading, & Timber Logger, LLC*, 2025 WL 1426503, at *8.

Further, under the structure of the MCAs, Debtor, not the Funders, retained the risk of nonpayment of its accounts receivable. In the MCAs, the Funders did not purport to purchase particular accounts receivable but rather a stated sum of all of Debtor's receivables. Doc 4-1 at p. 11; Doc 4-6 at p. 13. Debtor was required to

remit payment to the Funders in the dollar amount and at the interval specified in the MCAs. Doc 4-1 at p. 11; Doc 4-6 at p. 13. As a result, the Funders purchased "whichever accounts pay first" and took "only the minor risk that *none* of [Debtor's] customers would pay, rather than taking the risk that specific accounts will not be paid." *See In re Williams Land Clearing, Grading, & Timber Logger, LLC*, 2025 WL 1426503, at *8. In other words, the payments to the Funders comes

> from whatever money the debtor has available, which include accounts that have been paid, funds from other MCA companies, and any other monies that happen to be in the debtor's deposit account. In this way, the MCA funder's recovery is in no way tied to the performance of any individual account. If 20% of the accounts go uncollected, or 50%, or 70%, the funder's ultimate recovery remains payable from the first dollars received by the merchant. A reconciliation of the MCA, if available, could adjust the *timeframe* for repayment, but would not alter the principal amount owing.

*Id.* (quoting Kara J. Bruce, *Revenue-Based Finance in Bankruptcy and Beyond*, 45 No. 4 Bankr. L. Letter NL 1, 7 (Apr. 2025)); *see also In re Watchmen Security LLC*, 2024 WL 4903363, at *7 ("As to the ultimate question of 'how the parties allocated risk', it is clear that the Debtor and its principal, as guarantor, bore the entire risk of non-payment of the 'sold' (undifferentiated 9%) receivables with Creditor bearing no risk that it would be limited to recovery from the 'sold' receivables."); *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 20-cv-5120 (LJL), 2022 WL 1997207, at *11 (S.D.N.Y. June 6, 2022) ("The risk of non-payment thus falls entirely on Fleetwood. The failure of an account debtor has no consequence on the amount due.

If a Fleetwood account debtor failed to pay its debt or became insolvent, there would be no reduction in the Purchased Amount or on Fleetwood's obligations to pay the daily amount; Richmond would be repaid from the proceeds of any other Transaction.").

The Bankruptcy Court did not, as the Funders contend, ignore "authority from another judge of the Bankruptcy Court for the Middle District of Florida upholding sales of future accounts receivable as true sales." Doc 15 at p. 32 (citing *In re McKenzie Contracting, LLC*, 2024 WL 3508375). Notably, the Funders misconstrue the holding in *In re McKenzie Contracting, LLC*, which the Funders contend "concluded that several separate sales of future accounts were true sales." Doc 15 at p. 32. What the Funders omit however, is the context in which the court made its ruling. Specifically, in *In re McKenzie Contracting, LLC*, a creditor objected to the debtor's Subchapter V designation, arguing the "Debtor grossly understated its debts by omitting debt due to merchant case advance ('MCA') claimants in order to get below the $7.5 million debt limit." 2024 WL 3508375, at *1. The creditor was the only creditor out of the four MCA claimants that objected to the debtor's Subchapter V eligibility. *Id.* The court explained that, "for determining noncontingent, liquidated debt for eligibility purposes," the court may consider the debtor's bankruptcy schedules and the creditors' proofs of claim. *Id.* The court noted, however, that "in evaluating eligibility, the Court does not purport to adjudicate the

extent or validity of any specific claim, *only how it is filed and/or scheduled*." *Id.* at *1 (emphasis added). The debtor argued that the MCA claimants filed their claims as contingent and unliquidated and thus were excluded from the $7.5 million Subchapter V debt limit. *Id.* at *2.

After reviewing the proofs of claim filed by the MCA claimants, the court agreed with the debtor's contention that the claims were *filed* as true sales. *Id.* at *4. The court thus found "that Debtor has met its burden of proving, *for the purposes of Subchapter V eligibility*, that the other three MCA claimants have filed proofs of claim as sales (rather than loans) that should not be counted toward the $7.5 million debt limit." *Id.* at *4 (emphasis added). The court did not, as the Funders contend, conclude the MCA claims were in fact true sales. Rather, the court concluded only that, for Subchapter V purposes, the claims were filed as true sales and thus did not count toward the Subchapter V debt limit. *Id.*

Given the foregoing, the Bankruptcy Court did not err in finding that the MCAs were properly characterized as loans based on the substance of the transactions.

**2. The Funders rely on non-binding, non-precedential cases as well as inapplicable legal principles.**

The Funders boldly assert that "well-settled, and binding, Florida law compels a different conclusion" from the one reached by the Bankruptcy Court. Doc 15 at p. 42. For this proposition, the Funders cite *Craton Entertainment, LLC v. Merchant*

*Capital Group, LLC*, 314 So. 3d 627 (Fla. 3d DCA 2021), a per curium affirmance with only a string citation and no analysis or discussion. Florida law is well-settled that a per curium decision with no written opinion has no precedential value. *Dep't of Legal Affs. v. Dist. Ct. of Appeal, 5th Dist.*, 434 So. 2d 310, 311 (Fla. 1983); *see also Vachon v. Travelers Home & Marine Ins. Co.*, 403 So. 3d 451, 454 (Fla. 2d DCA 2025) (stating that decision upon which party relied, "as a per curium affirmance, is of *no precedential value whatsoever*"). As the Florida Supreme Court has explained, "[t]he rationale and basis for the decision without opinion is always subject to speculation." *Dep't of Legal Affs.*, 434 So. 2d at 312. Thus, "to look behind a PCA in search of support for a ruling is simply impermissible." *Vachon*, 403 So. 3d at 454.

Equally unavailing is the Funders' attempt to rely on "many rulings from Florida courts upholding the validity and enforceability of these agreements as purchase and sale agreements." Doc 15 at p. 43. The "many rulings" cited by the Funders are trial court orders, not appellate decisions, and "[t]rial courts do not create precedent." *Vachon*, 403 So. 3d at 451; *see also Wood v. Fraser*, 677 So. 2d 15, 19 (Fla. 2d DCA 1996) (taking "opportunity to remind trial courts again that they 'do not create precedent'").

The Funders also incorrectly assert that "[t]ransactions in which a portion of the investment is at speculative risk are not loans and are therefore excluded from

loan and usury statutes." Doc 15 at p. 40. To the contrary, Florida law recognizes that loans and other financing transactions may include an element of risk or speculation. Florida Statute § 687.03(4) provides that, if a loan, advance of money, line of credit, forbearance, or other obligation exceeds $500,000, then, for purposes of the usury statutes, the amount of interest does not include the value of property that "substantially depends on the success of the venture in which" the proceeds are used. Thus, the fact that a transaction contains an element of "speculative risk" does not mean the transaction is a sale rather than a loan. *See Diversified Enters., Inc. v. West*, 141 So. 2d 27, 30 (Fla. 2d DCA 1962) ("When the principal sum lent or any part of it is placed in hazard, the lender may lawfully require, in return for the risk, as large a sum as may be reasonable, provided it is done in good faith.").

The Funders also cannot find support for their arguments in Florida Statute § 559.9611, which the Funders baselessly contend "has made clear that the parties' designation of a contract as one for a purchase of receivables should be presumed correct rather than recharacterizing it as a loan." Doc. 15 at p. 48. Section 559.9611 is contained within the Florida Commercial Financing Disclosure Law, Florida Statute § 559.961, *et seq.*, which, as its name suggests, requires that certain disclosures be made in transactions that fall within the scope of the statute. *See* Fla. Stat. § 559.9613. The statute does not, as the Funders assert, "unequivocally demonstrate[] the Florida legislature's endorsement of receivable sales-based

financing as an alternative form of financing, which will not be deemed a loan whether otherwise designated and structured by the parties." Doc 15 at p. 48. Rather, the statute simply includes an "accounts receivable purchase transaction" as a type of "commercial financing transaction" subject to the disclosure requirements imposed by the Florida Commercial Financing Disclosure Law. *See* Fla. Stat. § 559.9611(1), (6); Fla. Stat. § 559.9612.

In sum, the Funders fail to demonstrate any error with respect to the Bankruptcy Court's findings. Rather, the Funders merely disagree with the conclusions reached by Bankruptcy Court. The Bankruptcy Court, after analyzing the provisions of the MCAs and weighing the totality of factors, found that the transactions were properly characterized as loans. The Bankruptcy Court's findings and conclusions are set forth in the thorough, 28-page Opinion, and the Funders fail to demonstrate the Bankruptcy Court committed any reversible error. Accordingly, the Confirmation Order should be affirmed.

## III. <u>THE CONFIRMATION ORDER SHOULD BE AFFIRMED BECAUSE THE FUNDERS WERE AFFORDED DUE PROCESS</u>.

The Funders argue the Bankruptcy Court erred by deciding the nature of the transactions at issue and the extent and validity of the Funders' alleged security interests in the main bankruptcy case instead of in an adversary proceeding. Doc 15 at p. 24. The Funders contend they were denied due process because, allegedly, they "had no notice whatsoever the issues raised in the Opinion even were issues, and

they certainly were not provided an opportunity to respond to them at any time." Doc 15 at p. 28. The Funders contentions manifestly are untrue. The Funders received actual notice that the nature of the MCA transactions and the extent and validity of the Funders' alleged security interests in Debtor's post-petition receivables would be issues for plan confirmation because *the Funders themselves raised these issues in their Objections prior to filing the adversary proceedings*.

On February 12, 2025, the Funders filed the Objections, in which they objected to confirmation of the Plan based on their contention that the MCAs were sales. Doc 3-28; Doc 3-29. In the Objections, the Funders argued that "Debtor improperly seeks to use the property it sold to [the Funders] pre-petition under the [MCAs] that it had no legal or equitable interest in as of the commence of the case to fund its Plan." *Id.* Based on this, the Funders argued the Plan was not proposed in good faith. *Id.* Through the Objections, the Funders plainly and unambiguously put the issue of the nature of their interest in Debtor's post-petition receivables squarely before the Bankruptcy Court, and they cannot complain they had no notice that this issue would be addressed as part of confirmation of the Plan.

Even assuming the issues raised in the Opinion had to be raised in an adversary proceeding, the Funders nevertheless were afforded due process because "actual notice is sufficient to satisfy due process, even where a debtor violates procedural requirements for supplying notice prescribed by the Bankruptcy Rules."

*Jackson v. Le Centre on Fourth, LLC (In re Le Centre on Fourth, LLC*), 17 F.4th 1326, 1336 (11th Cir. 2021); *see also In re Eddy*, 572 B.R. 774, 781 (Bankr. M.D. Fla. 2017) ("Even if a matter should, under the Bankruptcy Rules, be tried in the context of an adversary proceeding rather than a contested matter, where the parties have received sufficient due process, a court will not elevate form over substance and may consider the claim on its merits."); *Cabuya Cherokee, SA v. Vogt*, 532 B.R. 383, 389 (M.D. Fla. 2015) (creditors were afforded due process with respect to settlement agreement in bankruptcy case because agreement was discussed in multiple hearings, motions, and orders, and the creditors received notice of each of these events)

The principle that a party is afforded due process through actual notice notwithstanding a violation of procedure was firmly established by the United States Supreme Court in *United States Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010), a case upon which the Funders rely in their Initial Brief. In *Espinosa*, the debtor filed a plan proposing to discharge part of his student loan debt. *Id.* at 264. The creditor received notice of the plan but did not file an objection to the plan. *Id.* Several years later, the creditor sought to set aside the confirmation order, arguing its due process rights were violated because the debtor did not initiate an adversary proceeding seeking discharge as required under the Federal Bankruptcy Rules. *Id.* The Court disagreed and held that the debtor's failure to initiate an adversary proceeding did

not violate the creditor's due process rights because the creditor received actual notice of the filing and contents of the plan. *Id.* at 272. As the Court explained: "Due process requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* The Court concluded that the creditor's receipt of actual notice of the filing and contents of the plan "more than satisfied [the creditor's] due process rights." *Id.*

Here, the Funders not only received both actual notice *and* the opportunity to be heard on the issues addressed in the, but the Funders themselves raised the issues in the Objections to plan confirmation. Accordingly, the Funders have been afforded due process, and the Confirmation Order should be affirmed.

Dated: February 23, 2026.

/s/ *Daniel A. Velasquez*
**Daniel A. Velasquez, Esq.**
Florida Bar No. 0098158
dvelasquez@lathamluna.com
**Christina Y. Taylor, Esq.**
Florida Bar No. 0057616
ctaylor@lathamluna.com
**Latham, Luna, Eden & Beaudine, LLP**
201 S. Orange Avenue, Suite 1400
Orlando, FL 32801
Telephone: 407-481-5800
Facsimile: 407-481-5801

*Attorneys for Appellee, IVF Orlando, Inc.*

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the word limit of Fed. R. Bankr. P. 8015(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 9,952 words.

2. This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bank. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Time New Roman size 14 font.

Dated: February 23, 2026.

/s/ *Daniel A. Velasquez*
**Daniel A. Velasquez, Esq.**
Florida Bar No. 0098158
dvelasquez@lathamluna.com
**Christina Y. Taylor, Esq.**
Florida Bar No. 0057616
ctaylor@lathamluna.com
**Latham, Luna, Eden & Beaudine, LLP**
201 S. Orange Avenue, Suite 1400
Orlando, FL 32801
Telephone: 407-481-5800
Facsimile: 407-481-5801

*Attorneys for Appellee, IVF Orlando, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 23, 2026, a true and correct copy of the foregoing was filed using the CM/ECF system, which will give notice of electronic filing to all counsel of record.

Dated: February 23, 2026.

/s/ *Daniel A. Velaquez*
**Daniel A. Velasquez, Esq.**
Florida Bar No. 0098158
dvelasquez@lathamluna.com
**Christina Y. Taylor, Esq.**
Florida Bar No. 0057616
ctaylor@lathamluna.com
**Latham, Luna, Eden & Beaudine, LLP**
201 S. Orange Avenue, Suite 1400
Orlando, FL 32801
Telephone: 407-481-5800
Facsimile: 407-481-5801

*Attorneys for Appellee, IVF Orlando, Inc.*